. THOMAS CAHILL

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa May 10, 1883.*

1. ARREST—*power of officer to arrest without warrant.* Where a criminal offence has been committed, as, shooting at a person, and an officer is informed of that fact, so that he has reasonable grounds for believing the person to be arrested has committed such offence, he is expressly authorized by the statute to arrest such person without a warrant, and so he has the right to arrest one without a warrant who commits an assault and battery in his presence.

2. SAME—*right to break open doors to arrest.* The law is well settled that an officer who has arrested a criminal, when he escapes may, if it becomes necessary, break open the doors of his house to re-arrest him.

3. CRIMINAL LAW—*when proof of prior assault is material.* On the trial of one for murder, in shooting and killing an officer while breaking in the door of the defendant's house to re-arrest him after his escape from arrest for a criminal offence, the proof showed that the defendant was informed and knew the persons asking and seeking admittance into the house were officers seeking to arrest him, and that he refused to open the door. The defendant offered to prove that on the night before the shooting a crowd was in the yard and stoned his house, and that a part of that crowd was there at the time of the attempted arrest, which the court refused to admit: *Held,* that there was no error in the ruling.

4. SAME—*when prior assault will justify a resort to self-defence.* Prior attacks upon a person or his house may create a reasonable apprehension of danger when he is again attacked by the same person or persons, when, if no prior attack had been made, the acts of the assailant would not tend to produce in the mind of a reasonable man apprehension he was in peril. In other words, the proof of prior assault or threats might justify a defendant in the right of self-defence, when, in the absence of this, the assault made would not confer upon the party assailed the right to resort to self-defence of person or property.

5. SAME—*sufficiency of evidence to justify instruction as to officer's right to. arrest without warrant.* On the trial of a party for killing an officer while attempting to arrest him without a warrant, the proof showed that the officer who first arrested him heard a pistol shot, and on going to learn the cause was immediately informed by a person that the defendant had shot at him, and that when the defendant was charged by the officer with the shooting he attempted to escape: *Held,* that the proof of these facts was ample to justify the officer, and upon which to base an instruction as to the officer's right to arrest without a warrant.

6. CRIMINAL COURT OF COOK COUNTY—*branch court authorized.* The act of the legislature of April 21, 1881, that two or more of the judges of the Criminal Court of Cook county may each hold a different branch of said court at the same time, is authorized by section 26, article 6, of the constitution, declaring that the terms of such court shall be held by one or more of the judges of the circuit or Superior courts of Cook county, etc.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN G. ROGERS, Judge, presiding.

Messrs. FORREST & MAY, for the plaintiff in error.

Mr. LUTHER LAFLIN MILLS, State's Attorney, and Mr. HENRY WENDELL THOMPSON, for the People.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was an indictment against Thomas Cahill, in the Criminal Court of Cook county, for the murder of Patrick O'Brien, a police officer of the city of Chicago. The jury found the defendant guilty as charged in the indictment, and by the verdict fixed the punishment at imprisonment in the penitentiary for life.

It appears from the record that Thomas Cahill resided with his parents and brothers in a small house, known as No. 50 Rebecca street, Chicago. On the evening of August 1, 1881, James Ray, a police officer of the city, while sitting on the front steps of No. 68 Rebecca street, heard a pistol shot in the rear of the building. The officer, being dressed in his uniform, and his star on his coat, started to see what was the matter. He met one Keeling, who informed him that the defendant, Thomas Cahill, had shot at one Dixon. When he came up to Dixon, he, too, told the officer that Cahill had done the shooting. The officer then inquired where Cahill was. Dixon pointed to a man standing about sixty feet away, and said, "There he is." The officer walked to him, and inquired why he had shot at Dixon. The officer testified that he made no reply, but ran. The officer followed him to the house, where Cahill denied that he had shot at Dixon. The officer then returned home, and, as he testified, Mrs. Dixon soon came and said her son had been shot. While she was talking, Chris Dixon came up, and he said the ball went through his pants. Mrs. Dixon requested the officer to go and arrest Cahill, as she was afraid Cahill would shoot some of her boys that night. The officer agreed to go if Chris Dixon would go along and point the defendant out. The two then proceeded to the house occupied by the Cahills, when Chris Dixon stopped in the kitchen, and the officer went in the front room where the defendant was. The officer said to defendant that Dixon claimed he had shot at him, and defendant went into the kitchen and said to Dixon: "Do you say I shot at you?" and struck Dixon, and knocked him out of the door. The officer then arrested the defendant, and attempted to take him to the station, and when he got to the door the defendant pulled back, and, being assisted by his mother and brother, he got loose from the officer, and the officer was locked out of the house. The officer remained at the foot of the stairs a short time, when officer O'Brien and

others came up, and inquired what was the matter, and upon being informed, O'Brien said: "Come up, I know the man. Let me take him. I will have no trouble with him." As the officers went up the stairs, the Cahills went in the house and closed the doors. Admittance was demanded, and refused, and as O'Brien was pushing open the door he was shot by the defendant. Before an entrance was effected a number of shots were fired on both sides. According to the testimony of officer Ray, (and he is corroborated by the other officers,) O'Brien notified the Cahills at least twice that they were police officers, and desired admittance to the house. Upon this point officer Shenly testified: "I went to the top of the stairs. O'Brien said he was an officer, and wanted to get in. He then asked admittance the second time. He then put his shoulder to the door to break it, and a shot was fired."

Section 342 of the Criminal Code provides, that "an arrest may be made by an officer or by a private person, without warrant, for a criminal offence committed or attempted in his presence, and by an officer when a criminal offence has in fact been committed, and he has reasonable ground for believing that the person to be arrested has committed it." Here, Ray was an officer, and the shooting at Dixon was a criminal offence, and he had reasonable ground for believing that Cahill had committed the crime, and, under the statute, he had full authority to arrest without warrant. Again, Dixon was assaulted, in the presence of the officer, by the defendant, and an assault being, within the meaning of the statute, a criminal offence, it was the plain duty of the officer to make the arrest, without warrant, for the assault, independent of the other offence. We think there can be no doubt but the defendant was lawfully arrested by officer Ray. After the arrest, with the assistance of other members of his family, he escaped. For the purpose of re-arresting the defendant, did officer Ray and the other officers who came to

his assistance have the right to break open the doors of the
house where he resided?

In Foster's Crown Law, (page 319, sec. 22,) in the discussion of the doctrine that every man's house is his castle, it
is said: "The rule is likewise confined to the case of arrests
in the first instance, for if a man, being legally arrested,
escapeth from the officer, the officer may, in fresh pursuit,
break open the door in order to retake him." In 2 Hawkins,
(Bk. 2, chap. 14, sec. 9, p. 137,) in the discussion of the
question, "When doors may be broken open in order to
make an arrest," it is said: "Whenever a person is lawfully
arrested, for any cause, and afterwards escapes and shelters
him in a house." To the same effect is *Commonwealth* v.
*McGahey,* 11 Gray, 194. We think there can be no doubt
in reference to the law, and it may be regarded as well settled that an officer who has arrested a criminal, when he has
escaped may, if it becomes necessary, break down doors to
re-arrest him.

But it is said the court erred in refusing proper evidence
offered by the defendant. The defendant offered to prove
that the night before the shooting a crowd was in the yard
and stoned Cahill's house, and that a part of the crowd which
was there the first night was there at the time of the attempted
arrest. It is no doubt true that proof of prior attacks or
threats might authorize the person attacked to resort to self-
defence upon slighter evidence of attack than where no such
previous attack had been made. Proof of prior attacks might
create a reasonable apprehension of danger when an attack
was made, when, if no such prior attack had been made, the
acts of the assailant would not tend to produce in the mind
of a reasonable man apprehension that he was in peril. In
other words, the proof of previous attacks might justify a
defendant in the right of self-defence, when, in its absence,
the assault made would not confer upon the party assaulted
the right to resort to self-defence of person or property. But

40—106 ILL.

while this is true, it does not follow that the court erred in excluding the offered evidence. The theory of the defence was entire ignorance on the part of the defendant of the character of the persons who with force attempted to enter his house. If the defendant did not know the parties attempting to enter his house were officers, that they were attempting to re-arrest him, but was mistaken as to their character or object, then the acts of the officers were such as conferred upon him the undoubted right of self-defence. The acts of the officers showed beyond question that they were determined to enter the house at all hazard, and hence the evidence of prior attacks was entirely immaterial. The evidence of prior attacks did not enter into the question of the guilt or innocence of the defendant. It was not material as to what occurred the night before, but the question was, whether defendant was mistaken and ignorant of the official character of officer O'Brien and his assistants, and their object in entering his house. If he was,.it is not perceived how the evidence of previous attacks could enlarge his rights. The offered evidence merely tended to show that the defendant was in fear of danger,—not that he was ignorant of or mistaken in regard to the purpose of the officers, or that they were in fact officers attempting to re-arrest him for a supposed violation of the criminal laws of the State. We perceive no error in the exclusion of evidence.

It is also urged that there is no evidence in the record to furnish a basis for the People's instruction No. 5, or for the first part of instruction No. 6. These instructions merely announce the well-known rule that an officer has the right to make an arrest without warrant where a criminal offence has been committed in his presence, or where a criminal offence has been committed and he has reasonable ground for believing that the person arrested has committed the offence. Here the officer heard the pistol shot, and was at once informed that the defendant had fired at Dixon, and

when the defendant was charged by the officer with the shooting he attempted to escape. These facts were ample to justify the officer, and formed a sufficient basis for the instructions to the jury.

It is also claimed that the court in which the defendant was tried had no jurisdiction. This is based upon a description of the court, as contained in the *placita,* wherein the court is described as "a branch of the Criminal Court of Cook county." Section 26, article 6, of the constitution, declares: "The terms of said Criminal Court of Cook county shall be held by one or more of the judges of the circuit or Superior courts of Cook county, as nearly as may be, in alternation, as may be determined by said judges, or provided by law." Under this provision of the organic law the legislature, on the 21st day of April, 1881, (Laws of 1881, page 72,) passed an act as follows: "Be it enacted, etc., that two or more of the judges of the Criminal Court of Cook county may each hold a different branch of said court at the same time." We think the language of the constitution is broad enough to authorize the passage of the act. It was certainly never intended that two of the judges should sit together and constitute the court. If not, then the language, "one or more of the judges," was intended to authorize the holding of a branch court when the business had increased to such an extent that it could not be done by one judge, and when the legislature might provide for the holding of a branch court.

The judgment of the Criminal Court will be affirmed.

*Judgment affirmed.*