GEORGE F. ROBISON, PROSECUTING ATTORNEY OF WAYNE
COUNTY, v. JOHN MINER AND EDMUND HAUG,
POLICE JUSTICES OF THE CITY OF
DETROIT.

[TWO CASES.]

*Constitutional law—Liquor law of 1887—Title of act—Bond of dealer
—Authority of municipal board to reject—Right of county
treasurer to require new bond—Arrest—Breach
of the peace—Penalty—Forfeiture of business.*

1. The title to Act No. 313, Laws of 1887, namely, " An act to pro-
vide for the taxation and regulation of the business of manufact-
uring, selling, keeping for sale, furnishing, giving, or delivering
spirituous and intoxicating liquors, and malt, brewed, or fer-
mented liquors, and vinous liquors, in this State," covers but one
*general* subject-matter.

2. The following provisions of the liquor law of 1887 are held uncon-
stitutional:

  *a*—Authorizing the approving board to reject a bond if the
principal is known to them "to be a person whose character and
habits would render him or her an unfit person to conduct the
business of selling liquor."

  *b*—Authorizing the county treasurer to require new bonds "in
any [other] contingency that he shall determine requires it."

  *c*—Allowing and directing various officers to close places of
sale on their own determination of facts, and to arrest parties
without process for a breach of the peace.

  *d*—Providing for the forfeiture of business in addition to fine
and imprisonment.

3. The new taxes and penalties not involving the peculiar disabil-
ities named are valid, as well as the new method of prosecution
in the upper instead of justice's courts, and, except as pointed
out, the law may be enforced.[1]

Application for *mandamus* to require respondents to enter-
tain jurisdiction to hold preliminary examinations in criminal

---

[1] See *Luton v. Palmer*, 69 Mich. —— (37 N. W. Rep. 701).

| 68 | 549 |
| 69 | 613 |
| 68 | 549 |
| 70 | 499 |
| 68 | 549 |
| 73 | 9 |
| 68 | 549 |
| 80 | 650 |
| 68 | 549 |
| 85 | 121 |
| 68 | 549 |
| 86 | 177 |
| 68 | 549 |
| 89 | 103 |
| 68 | 549 |
| 91 | 97 |
| 92 | 394 |
| 68 | 549 |
| 96 | 198 |
| 96 | 204 |
| 68 | 549 |
| 101 | 420 |
| 101 | 427 |
| 68 | 549 |
| 106 | 602 |
| 68 | 549 |
| 107 | 572 |
| 68 | 549 |
| 111 | 32 |
| 68 | 549 |
| 141 | 98 |
| 68 | 549 |
| d149 | 204 |
| 68 | 549 |
| 153 | 2119 |
| 68 | 549 |
| f154 | 1321 |
| 68 | 549 |
| j157 | 432 |
| 157 | 2439 |
| 157 | 2560 |

prosecutions under the liquor law of 1887. Submitted January 10, 1888. Granted as to Justice Miner, and denied as to Justice Haug, March 2, 1888. The facts are stated in the opinion.

*George F. Robison,* prosecuting attorney (*Edwin F. Conely* and *C. A. Kent,* of counsel), for relator.

*Isaac Marston* and *F. A. Baker,* for respondents.

CAMPBELL, J.   The object of these two applications, one of which is made against each respondent, is to require them to entertain jurisdiction to hold preliminary examinations in criminal prosecutions under the revision of the liquor laws of 1887.   They decline doing so upon the claim that the statute embodying that revision is invalid because, as they insist, it contains unconstitutional provisions, which are so connected with the prosecution clauses of the act that they must stand or fall together.   If this defense is made out it will be fatal, and will defeat the application for our intervention.   We are therefore required to consider it.

As none of the previous laws on the subject are repealed except by the general clause repealing all inconsistent statutes and parts of statutes, we are saved some discussion that might otherwise be required.   The present statute covers the whole ground, and was meant to provide a full system of legislation to replace the old, and there are no important provisions in the old laws that are not more or less affected by the new one.

The act in question was approved June 28, 1887, subsequent to the act popularly known as the "Local Option Law," which must stand on its own merits as meant to apply by its terms whether the old or new law should be in force. That statute does not seem, therefore, to form any essential feature of this controversy, and we cannot properly consider it on this record.

The statute before us is entitled—

" An act to provide for the taxation and regulation of the business of manufacturing, selling, keeping for sale, furnishing, giving, or delivering spirituous and intoxicating liquors, and malt, brewed, or fermented liquors, and vinous liquors, in this State, and to repeal all acts or parts of acts inconsistent with the provisions of this act."

Some question was made whether this title is not multifarious in covering distinct objects. But we see no such necessary difficulty in it. There is but one general purpose indicated by it, and that is to reduce to one system all dealings with liquors of every sort which include such varieties as may intoxicate, and while these varieties may be numerous, and may include some kinds which are not intoxicating, it would be difficult to make a title that would make that specific discrimination without verbosity, or without creating confusion. The regulation of such beverages as in the opinion of the Legislature need regulating has always been regarded as a single branch of policy, and it would not be difficult to make a shorter title which would cover all the ground covered by the title of the act in question. The object is clearly a single one, capable of subdivision in details. It may be possible to include in legislation on that matter provisions that would not fairly come within the title; and of course, under our Constitution, those provisions would have to be rejected. But the title itself is not open to this objection. It covers but one general subject-matter.

The present law combines together, but under new regulations, a number of matters which have been treated heretofore to a considerable extent under different statutes and amendments. It includes the rules of taxation which the Legislature have seen fit to adopt, and new methods of enforcement, and a considerable number of provisions changing the penalties and modes of arrest and trial, imposing various forfeitures not before imposed, transferring the litigation from justices' to the higher courts, giving new

power to officers, and in other ways making more stringent and severe regulations running through most of the parts of the law. It is largely in reference to the conditions and the penal methods and consequences that the law is complained of. The chief particulars of the complaints will be referred to.

The tax or license for doing business is considerably increased, and new conditions are imposed on the business. These changes or modifications involve, in regard to druggists violating the law in any way, a fine not less than $100, nor more than $500, or imprisonment not less than 90 days, nor more than a year, or both fine and imprisonment. In case of a second offense the person charged is, in addition to the other punishment, to be debarred from selling in this State any such liquors for five years. The liquors he is allowed to sell are confined to chemical, scientific, medicinal, mechanical, and sacramental purposes.

Other persons are to pay in advance the coming year's tax, ranging from $300 to $800, on payment of which a large and conspicuous printed notice, as well as a receipt, specifying the amount and purpose of the tax paid, and the place and conditions of business and the penalties, etc., of the act are to be furnished. This receipt and notice are to be kept conspicuously posted, so as to be manifest to all comers. A bond also is required to be fixed as presently noted. A failure in any of these particulars involves punishment for misdemeanor to the extent of $200 fine and 90 days' imprisonment, or either, and imprisonment up to six months if the fine is not paid. And it is further provided that any person doing business, who has paid his tax, if—

"Convicted of a violation of any of the provisions of this act, shall thereby, in addition to all other penalties prescribed by this act, forfeit the tax so paid by him or them, and be precluded from continuing such business for the remainder of the year, or time for which said tax was paid, and be debarred from again engaging in any business requir-

ing the payment of a tax under section 1 of this act, or from becoming a surety or sureties upon any bond required under section 7 of this act, for the period of one year from the time of such conviction. Each violation of any of the provisions of this act shall be construed to constitute a separate and complete offense, and for each violation, on the same day or on different days, the person or persons offending shall be liable to the penalties and forfeitures herein provided, and be precluded and debarred from continuing or engaging in any business requiring the payment of a tax under this act as aforesaid. And it shall be the duty of sheriffs, marshals, constables, and police officers to forthwith close all saloons and other places where the business of manufacturing, selling, or keeping for sale any of the liquors mentioned in section 1 of this act is being conducted, upon which business the tax required by said section 1 has not been paid in full, and in which the receipt mentioned in section 5 of this act shall not be posted up and displayed."

It will be observed that by some mistake or otherwise reference is made to section 7 for a bond and to section 5 for a receipt. Those sections contain no such provisions.

Bonds are required of all dealers yearly of not less than $3,000, nor more than $6,000, to secure the public and others from illegal sales. The sureties are to be freeholders of the municipality, holding no office unless that of a notary public, and not sureties on any other bond, who are to justify as owners of sufficient real estate in the county, beyond debts and exemptions. The bond is to be approved by the municipal board or trustees or council upon affidavits. And if, in the judgment of that body, the sureties are inadequate,—

" Or if the principal of said bond is known by said township board, or the board of trustees or common council of the village or city, to be a person whose character and habits would render him or her an unfit person to conduct the business of selling liquor, they, the said township board or board of trustees, the council or common council of the village or city, as the case may be, shall refuse to indorse said bond with their approval."

A new bond shall be required by the county treasurer in case of the death, insolvency, or removal of either of the

sureties, "and in any other contingency that he shall determine requires it." Any sale contrary to this section is made a misdemeanor, punishable "as provided in section six of this act." Section 6 does not provide any punishment, but refers to other matters.

One-half of the tax moneys is to be retained by the county treasurer, in the general fund of the county, and the other half is to be paid over to the municipalities where it is collected, except in the Upper Peninsula, where all is paid over to the latter bodies.

By section 17 the hours of sale are limited, and sales on certain days are forbidden; and by the same section any person violating its provisions is declared guilty of a breach of the peace, and to be punished accordingly. It is further declared:

"And the arrest therefor may be without process, and this punishment shall be taken to be in excess of all other manner of punishment in this act provided for a violation of the provisions of this section. All officers authorized to make arrests for a breach of the peace shall have like power to make arrests under the provisions of this section as in other cases of a breach of the peace."

By section 18 all persons violating any of the five preceding sections are made guilty of a misdemeanor, and punished as provided by section 7. Section 7 contains the provisions for fine, imprisonment, forfeiture, and disabilities before referred to.

Section 24 makes principals liable for the acts of their clerks and servants.

There are special provisions against adulteration, and for removing all obstacles to seeing the interior of buildings during the hours of closing, and some other special and local provisions not necessary to be referred to now.

There is no question but that the statute contains provisions not capable of being sustained, as well as some that are inconsistent and imperfect. While the bond is fixed, or capa-

ble of being fixed, in amount, the statute allows the local body approving the bonds to refuse doing so to any person whose character and habits would render him or her an unfit person to conduct the business of selling liquor, and this is done on their supposed knowledge of the unfitness. Such a refusal may operate to the ruin of the applicant and a practical distruction of his business, and injury to a forfeiture of the enjoyment of his property cannot be avoided.

Where licenses are granted to limited numbers of people, it is sometimes provided that applicants shall present evidences of character in the place where they live; but it would be anomalous to allow any one to be disqualified from business and branded with disgrace, both of which are really heavy punishments, on the mere will of anybody. This law does not by its terms or intent operate as an ordinary license law limiting the number of vendors. It is general, anybody may sell whose bonds are accepted. If the law itself singled out any class or classes of persons as improper to be allowed to carry on this business, then the only inquiry would be as to the fact of any one belonging to the forbidden classes. But, in such a case, without an admission of it, the applicant would certainly have the right to some hearing on the facts, and to be assured a hearing which could be examined by some court in case of capricious abuse. The subject was somewhat discussed in *Dullam v. Willson*, 53 Mich. 392 (19 N. W. Rep. 112), where many cases were referred to, showing the right of accused parties to know what they are accused of, and to have a hearing which will give them means of fairly meeting the charges. Without this there can be neither fairness nor uniformity in the operation of the law. If no standard is laid down, there may be as many scales of fitness and unfitness as there are boards. We have already had occasion, under the old law, to discover that boards desirous of preventing liquor selling are ingenious in finding fault with bondsmen. There are very many excellent people who regard

every seller of liquor as a bad man, unfit for social privileges, and others who hold peculiar views on other topics, which would render them harsh censors. If the statute had fixed the rule, there would be means of protecting parties against caprice and condemnation unheard. But when the same persons are to be judges of the proper causes of rejection, as well as of the fitness of persons under such causes, the law subjects every one to the mere will of his neighbors, and gives him no rights whatever. No man's rights can be submitted, under a constitutional government, to the discretion of anybody. *Frazee's Case*, 63 Mich. 396 (30 N. W. Rep. 72).

The power in a county treasurer to require new bonds in any contingency which he determines should require it, is still worse, for it works a forfeiture of the rights obtained by paying the taxes imposed for the year's business, as well as the breaking up of the business. This cannot be done. The specified causes, so far as they go, are not illegally laid down, although the law is deficient in providing no method of getting at the facts by a hearing before any one. The treasurer is given such powers by this legislation as cannot be sustained on any legal principle.

The statute has made some stringent provisions concerning places of sale which of themselves indicate more or less of the dangers especially regarded, but it points out no classes of persons who may or may not be allowed to sell, and leaves the whole subject, so far as the provisions above referred to are concerned, to the unlimited discretion of the local boards and the county treasurer.

These provisions underlie the whole policy of the statute. It provides that no one shall sell except on the condition specified, and it leaves it discretionary with local boards to deprive any person of the right of selling on their private judgment as to his unfitness.

Another class of provisions coming clearly within the prohibition of the Constitution embraces those which allow and

direct various officers to close places of sale on their own determination of facts, and without process to arrest parties as for a breach of the peace.

The Constitution prohibits interference with persons or property without due process of law. The proceedings under this statute are all highly penal, and treated expressly as criminal proceedings. The Constitution expressly prohibits the issue of warrants of search or seizure of persons or property except on a sworn showing, which, it has always been held, must be of facts on personal knowledge such as would establish the legal probability of the cause of complaint. If the Legislature could evade this by providing for seizures and searches without legal warrant, the provision would be useless.

A somewhat similar question arose under one of the early prohibitory laws, which provided for searches and seizures under warrants issued by magistrates upon a sworn showing, but without adequate provision for notice or regular trial in the ordinary course of law, and this was held unconstitutional because no such action could be had except for the purpose of a criminal trial, or without full safe-guards against abuse of process. *Hibbard v. People*, 4 Mich. 125. The facts in that case were very far short of what is intended by this statute. Here the effect of closing a place of business, which may be done both without warrant and without trial, is to enable any irresponsible officer, of his own motion, to do what, if lawful at all, could only be so after final judgment.

So far as arrests are concerned, a similar principle applies. Under our system we have repeatedly decided, in accordance with constitutional principles as construed everywhere, that no arrest can be made without warrant except in cases of felony, or in cases of breaches of the peace committed in the presence of the arresting officer. This exception, in cases of breaches of the peace, has only been allowed by reason of the

immediate danger to the safety of the community against
crimes of violence, and it was confined, even in such cases, to
instances where the violence was committed in the presence
of the officer.   There are not many such cases.   The com-
mon and statute law provide for very few specified breaches
of the peace, and there are none that are not specified.   An
indictment charging a person as a peace-breaker, and not
with any specified crime, would be good for nothing.
Assaults and riotous conduct make up the largest part of
the list.   But there can be no breach of the peace within the
meaning of the law that does not embrace some sort of vio-
lent as well as dangerous conduct.   The manifest purpose of
this statute is to bring certain things that are not breaches
of the peace within that denomination to avoid the necessity
of a warrant.   But, as already suggested, the Constitution
cannot be so evaded.   The cases covered by the statute pre-
sent some peculiar features.   No doubt keeping open places
of sale late in the evening may lead to breaches of the peace,
and, when they actually occur in an officer's presence, arrest
may be made for that.   Most of the acts denominated
breaches of the peace by this act are fixed after the regular
closing hours at night.   An officer arresting without pro-
cess must, as soon as practicable, take his prisoner before
the nearest magistrate, where he can be bailed, or examined,
or put on trial, as the case may be.   But the arrests provided
for in this act would necessarily keep the parties arrested
imprisoned until a magistrate could be found, and probably
hold them in durance until the next day at least, and sub-
ject them to more than usual annoyance.   Needless noctur-
nal arrests are among the greatest abuses which officers can
practice, and where, as will sometimes at least be the case,
there is no legitimate cause for accusation, and the officer is
irresponsible, the wrong is very great and without any ade-
quate civil remedy.

It was also held in a number of cases which have been

famous in history that no general warrants could lawfully issue at common law, and our Constitution has embodied that idea in very clear and express terms. But this statute is practically, if carried out, a general warrant itself, directing all officers to visit houses and business places without other authority, and make searches and arrests, and close up places of business on their own well or ill founded notion that the law has been violated.

It is a matter worthy of consideration, at least, whether the law is not equally defective in dealing with these arrests even if otherwise valid. It makes the breach of the peace punishable without being a bar to other regular proceedings for the same offense. But there is no punishment affixed by law to any undefined breach of the peace. Some of these acts are punishable by justices. Some are indictable felonies and misdemeanors. But a charge of breach of the peace, and nothing more, is not a definite charge, and the arrest made on such a charge could lead to no trial, and would come within the mischief of *Hibbard v. People.* There is no point of view in which these proceedings can be sustained.

It is also insisted that the law violates the constitutional rule of punishment, both as to severity and as to inequality. The fourteenth amendment to the Constitution of the United States forbids the enactment by any state of what will deprive any person within its jurisdiction of the equal protection of the laws, or deprive any person of life, liberty, or property without due process of law. These provisions have the double sanction of State and National Constitution, and are to be fairly applied, not alone, but in connection with other provisions. Our State Constitution declares that—

"Excessive bail shall not be required; excessive fine shall not be imposed; cruel or unusual punishment shall not be

inflicted; nor shall witnesses be unreasonably detained." Article 6, § 31.

Article 13, § 12, declares all fines collected for breaches of the penal laws to be devoted to school or library purposes.

While some of these provisions have not been much discussed in our day, it is chiefly because very little legislation has been put in force that called for it. There have always been laws on the statute book which might call for consideration, if attempts were made to carry them out. The practically unlimited power of parliament has prevented any such question being raised in Great Britain in modern times, and the few precedents that may be found in their statutes throw no light on a system designed to prevent such abuses as suggested it. But we have in all the great charters against oppression some provisions which were the origin of the more important clauses in our own bills of rights. Few, if any, of these were originated in those documents. The great charter and its successors, and the declaration and bills of rights of the seventeenth century, have always been treated as only declaratory of the common law, and not as new inventions. Our own people so regarded them in the manifestoes put forth by those congresses which met during the decade preceding the American Revolution, and in the Declaration of Independence, which set forth what were claimed to be violations of these common rights.

In order to compare the law in question with these rules, it may be well to point out in one view the punishments and consequences complained of. For every offense, small or great, under the law, there are fines and imprisonment provided for which in themselves are not relied on as incompetent. But for most of the offenses further consequences are made to follow on every conviction, and in some cases without any conviction. The statute leaves no discretion to any court on the subject.

Every person authorized to deal in any form with liquors

is held liable criminally for any acts or neglects of his servants. The first persons named are druggists, in whose business the law recognizes a necessity for the use of fermented and spirituous liquors for medical purposes, and allows a sale for some other purposes where it is regarded as equally necessary. Every druggist is, besides the limitation on the purposes for which he may sell, required to keep a full record of purchasers and purposes of purchase, open to the daily perusal of the entire public, and any single omission, intentional or accidental, subjects him to the penalties of the act, which in his case are prosecution for misdemeanor, subject to fine of not less than $100 nor more than $500, and imprisonment may be added of not less than 90 days, nor more than a year. For a second offense this statute debars the druggist for five years from making any sales of liquor for any purpose, as druggist or otherwise.

For other persons the general punishments and forfeitures are these: For engaging in business without the tax paid and bond given, or without posting up the receipt and notice mentioned in the law, the party is held guilty of a misdemeanor, subject to fine of not more than $200, and imprisonment may be imposed of not less than 10 nor more than 90 days, separate or additional, with further imprisonment till paid, not more than six months in all; and this applies to all violations of the act by such unauthorized persons or by any others. But those who have complied with the act and given bonds are subjected to still heavier consequences than those who have not. The law declares that, in addition to all other penalties provided by it, they shall forfeit the tax paid, which, for the various classes of business, is $65 for manufacturing brewed liquors, $300 for the sale of brewed liquors, $500 for retailing liquors generally, and $800 for general wholesaling and retailing, and for manufacturing liquors generally. The amount of this forfeit would make a very heavy penalty, and much heavier than any of the specific

68 MICH.—36.

penalties mentioned in the act for any offense whatever. In addition to the forfeiture of the tax and the other penalties, the offender is made incapable of continuing business for the rest of the year, and for one whole year after conviction, which may take place at any time not barred by the statute of limitations, and at any period of any year. There is a further disability created against becoming surety on any bond under the act for a full year after conviction. And the same section 7 makes it the duty of any officer to forthwith close all establishments where the proper card is not kept displayed. No saving clause is made for its loss or destruction without the owner's fault, and none for renewing it. This involves penal consequences of the most serious kind without charge or trial.

There are several passages in the statute which seem to indicate that it is in part made up of older laws confined to a smaller field, and inserted here without verbal changes so as to create some incongruities. Some provisions in regard to the adulteration of liquors have been so introduced. But there is no need of referring to them now.

The disabilities and other peculiar consequences before referred to are made obligatory and inseparable from every conviction. They may, and in some instances must, involve practical ruin to the offender. A druggist, cut off for five years from his business, may suffer a loss of immense sums, and so may any large manufacturer or large dealer by having his store shut up and his business barred. It not only must usually bring about bankruptcy, but it also includes what is meant to be an infamous disability,—to receive credit as a surety.

The great charter made it unlawful to impose any penalty or forfeiture which should deprive a man of what is translated his "contentment," or a person in any kind of business, whether commercial or otherwise, of the means of continuing that business. Seldom speaks on this subject with

some force in censuring the fines imposed in his time, which he says were in violation of this provision, and which led, among other things, to the bills of rights.    Seld. Tab. Talk, "Fine."   He says that the meaning of the great charter was to allow no man to be deprived of his ability to live according to his usual estate or "countenance."    The great fines imposed during the times of the Stuarts, especially by the star chamber, were among the worst abuses of that period of tyranny.   But very few, if any, instances can be found where men were made to forfeit their whole business receipts, and none certainly where they were made incapable of doing their ordinary business.    The forfeiture of indefinite interests or sums only occurred in felonies when the penalty was death as well as forfeiture.    It was in felonies, too, that disgrace and incapacity for any of the rights of citizens were imposed as penalties.    These punishments have always been regarded as incompatible with our institutions, and there can be no doubt that the cruel and unusual punishments forbidden by the United States Constitution had special reference to the barbarities of the old law of felony.    It is equally clear that any fine or penalty is excessive which seriously impairs the capacity of gaining a business livelihood.    The penalties in this act, which are imperative and not discretionary, must necessarily break up business, and are not measured by any standard of proportion or amount.    The only measure of restraint is the value of the business broken up, and this may reach tens or hundreds of thousands of dollars.

It is safe to say that throughout the United States any fine or forfeiture is unusual which has not some limitation of value, and any punishment is unusual which forfeits any civil rights.   Dueling and conviction on an impeachment are the only two things in most states which involve civil incapacities of a public nature, and both of these are provided

for by the Constitution. Disability to transact business is almost or quite unheard of in this country.

The important question remains, how far the objections referred to destroy the statute. Although there is some difficulty in assuming that the Legislature would have passed the statute as it must be modified, yet it must be presumed they would have yielded to the constitutional objections if plainly pointed out; and in most other respects the law does not differ in principle from the existing legislation, and the new taxes and penalties not involving the peculiar disabilities named are valid, as well as the new methods of prosecution in the upper instead of the justices' courts. We therefore hold that, except as we have before pointed out, the law may be enforced. If difficulties arise upon points not considered, by us, they will have to be dealt with as they arise; but there is no likelihood that there will be any such trouble in enforcing the essential parts of the law, and we cannot anticipate any serious question with the light we have received from the argument.

It follows that the *mandamus* against Justice Hang must be denied, as the application to him set out no offense in proper terms. The *mandamus* must issue to Justice Miner.

CHAMPLIN, MORSE, and LONG, JJ., concurred.

SHERWOOD, C. J. In these cases very important questions are presented. They interest every citizen in the State, and the welfare of every community. We are asked to compel by the mandate of this Court the judicial officers of the city of Detroit to take cognizance of cases of violation of the liquor law in this State enacted on the twenty-eighth day of June, 1887, for the purpose of regulating the manufacture and public sale of intoxicating liquor.

While I have no doubt that the object sought to be accomplished by the law in question is clearly within the province of the Legislature, under the police power of the State, yet

there are several provisions of this law which are unconstitutional and dangerous, and it would be unsafe to attempt to enforce them.

The manufacture or sale of intoxicating liquor carried on under the law, and according to its provisions, constitutes a legal business, and the liquor itself is property in the hands of its owner, and both the business and the property are entitled to the same protection from the law, so long as carried on lawfully, as any other business or property.  Under the statute in question all persons paying the tax and giving the required bond approved may engage in the business. No class is excluded, but without such approved bond no person can engage in the business.  The language of the statute, which requires the bond necessary to be given as the condition upon which the business may be engaged in, in regard to qualifications of persons taking out license, is:

"If the principal of said bond is known by said township board, or the board of trustees or common council of the village or city, to be a person whose character and habits would render him or her an unfit person to conduct the business of selling liquor, they, the said township board, or board of trustees, the council or common council of the village or city, as the case may be, shall refuse to indorse said bond with their approval."

And without such approval the county treasurer cannot receive the bond.  And the act further provides that—

"A new bond shall be required by the county treasurer, with whom such bond was originally filed, in case of the death, insolvency, or removal of either of the sureties, and in any other contingency that he shall determine requires it,"—

And the party can sell no more liquors until such bond required by the treasurer is given, and approved by the municipal board, as was the first bond.

Thus it will be seen that this law places it in the discretion of the municipal board and that of the county treasurer to say whether any man may engage in this lawful business.

Under these clauses, by attributing to the applicant for the privilege of selling and doing business certain traits of character which he may never have possessed, but which are regarded by them as a disqualification, he may thus be precluded from engaging in the business altogether.

I agree with my Brother CAMPBELL, this cannot lawfully be done under our form of government. It is within the province of the Legislature to allow any person to engage in the business of making and selling intoxicating liquor. It is also within its power to limit the business to certain persons, or classes, or to attach to its exercise conditions and such restrictions as it may deem proper for the best interests of the State and the people, not inconsistent with the spirit of the provisions of the Constitution.

But when conditions only are imposed, and all persons are permitted to engage in the business upon performing such conditions, the business remains a lawful one while it may be carried on, and such conditions must be reasonable. The Legislature alone has the power to impose them, and when they relate to qualifications of the person who is to carry it on, involving his character and habits, requiring those of fitness for the business, the law-making power should be specific in its requirements, and state particularly the elements entering into the necessary qualifications. This should be done that persons desiring to engage in the business may know whether they possess such qualifications or not, and, if they are denied to them, that they may have the opportunity of showing that they do possess them.

The right to carry on a lawful business cannot be made to depend upon the arbitrary will or caprice of any man, or local board, as is done under this law. Some standard of qualification must be fixed by the law itself, and then, whether the person who desires to engage in the business possesses the qualifications, measured by such standard, may be submitted to and determined by such local board as the

Legislature may designate. The provision relating to the action which may be taken by the county treasurer is a most remarkable one. He is expressly permitted to determine in what contingencies he will require the dealer in liquors to give a new bond or stop his business until it is done. The proper enforcement of the police regulations of the State requires the exercise of no such arbitrary and despotic power as is vested in the county treasurer in this provision of the act. It is simply intolerable under our Constitution and system of government.

I do not think the law is objectionable in its title. The title is broad enough and sufficiently specific to embrace all the provisions of the act, and they all relate to the same subject.

Neither do I think it competent, under our Constitution, for the Legislature to authorize a sheriff, marshal, constable, or police officer to close up a man's business at a time and place when and where he is allowed, under the law, to carry on such business upon complying with certain precedent conditions, when they have been performed, because such officer thinks he has good reason to believe that the dealer has been or is carrying on the business unlawfully, or has incurred a penalty or forfeiture in the manner he is carrying it on, as is permitted under section 7 of this act. A lawful business can only be interfered with, or a person's property taken from him or destroyed, after the owner has been served with proper process, and he has had his day in court, and been allowed the benefit and advantages of due process of law, and judgment of condemnation has passed against him. It is then, and not till then, the ministerial officer can act, and such action must always be confined to the execution of the judgment and mandate of the court. The protection the law gives to the business and property of the citizen is not left to the discretion of a sheriff, a marshal, or a policeman, but to the law of the land, with courts, and officers under their direc-.

tion to execute it. Of this protection to private property no owner can be lawfully deprived for a single moment. It must be recollected that the violations under section 7, which authorize such interference, refer to times and occasions when and where the business could be lawfully conducted and performed by the owner.

This is not so under section 17 of the act, which reads as follows:

"All saloons, restaurants, bars, in taverns or elsewhere, and all other places, except drug-stores, where any of the liquors mentioned in this act are sold or kept for sale either at wholesale or retail, shall be closed on the first day of the week, commonly called 'Sunday,' on all election days, on all legal holidays, and until 7 o'clock of the following morning, and on each week-day night from and after the hour of 9 o'clock until 7 o'clock of the morning of the succeeding day. And it shall be the duty of sheriffs, marshals, constables, and police officers to close all saloons, houses, or places that shall be found open in violation of the provisions of this section, and to report forthwith all such violations to the prosecuting attorney, whose duty it shall be to immediately prosecute for such violations.

"The word 'closed' in this section shall be construed to apply to the back door, or other entrance, as well as to the front door; and in prosecutions under this section it shall not be necessary to prove that any liquor was sold: *Provided*, That in all cities and incorporated villages the common council, or board of trustees, or council, may, by ordinance, allow the saloons and other places where said liquors shall be sold to open at 6 o'clock in the forenoon, and to remain open not later than 11 o'clock in the afternoon, and no longer, of any week-day night, except on election days and holidays.

"Any person found in the act of violating any of the provisions of this section shall be deemed guilty of a breach of the peace, and punished accordingly; and the arrest therefor may be without process, and this punishment shall be taken to be in excess of all other manner of punishment in this act provided for a violation of the provisions of this section.

"All officers authorized to make arrests for a breach of the peace shall have like power to make arrests under the provisions of this section as in other cases of a breach of the peace."

This section prohibits the business being done at the times and in the places named, or the places being kept open, and a violation of the law in these respects is declared to be a breach of the peace, and the offense is punished accordingly. Under this section the most of the offenses are for violations in the night-time, when peaceable citizens are seeking repose; a time, too, when evil-disposed persons usually commit crime, breaches of the peace, and violations of good order, when the constabulary or police officers alone are expected to be in the vicinity, or able to make observation. The offense, too, is one that only needs to be seen to be detected, and if, when the violation is detected, the officer is not permitted to close the doors of places of this sort, where and when it is forbidden to open them, or to carry on the business, and the offense is a breach of the peace, under such circumstances it is very clear that the community and society would be deprived of the most beneficial results intended by the legislation.    To close the doors of saloons opened during the hours specified in this section is not, as is contended, destroying a man's lawful business, but to prevent him from committing a breach of the peace by doing an unlawful act, one forbidden and made criminal by law.   I think the Legislature may well authorize the officer to close the door of the saloon under such circumstances.   I think this power is included in the power to prohibit, which has long since been adjudicated in this State to exist.   I see nothing in this section unconstitutional or objectionable, nor anything more authorized than a reasonable exercise of the police power of the State will permit.

It is the arrest under this section, which is authorized to be made without process, of which much complaint is made. There is no doubt but that, under the law as established by this Court, it is entirely competent for an officer to make arrest without warrant of a person who is committing a breach of the peace in his presence, or is about to commit the

same.   Such was the rule at common law, and in my judg-
ment it is good common sense.   It is claimed, however, that
this rule should not apply to breaches of the peace created
by statute.

While it has always been conceded by the ablest jurists,
both in England and this country, that the common law fur-
nished, at the time of its adoption, the best system of rules
for the regulation of society, the community, and the state
in a free government, still I do not understand that any of
them have ever yet held that it contains the perfection of
reason, nor that the offenses, misdemeanors, and crimes it
recognized, defined, and classified, include all the offenses
which persons are capable of committing against the peace
and dignity of the people, or against good order and society.
The convention of the people which framed our Constitution
found the common law existing in the State as a part of the
government, and, by an express provision, continued it as
amended or changed by statutes then in force, when not
repugnant to the Constitution, until altered or repealed by
the Legislature.   It is not, and never has been, in any sense
supreme.   The Legislature has full power over the whole
system of laws it embodies, subject only to the Constitution
of our State.

The Legislature is invested with the full power to adopt
such police regulations for the State as it may in its wisdom
see fit to make within the limitations of the Constitution, and
it is its duty to adopt such regulations as will insure the
peace, tranquillity, and good order of the people in every por-
tion of the State, and for this purpose the Commonwealth
may be regarded and is as one entire police district.   The
Legislature may, in its efforts to accomplish this object, when-
ever found necessary, create new crimes and offenses, and add
them to the classifications of the common law, or classify
them anew.   Many kinds of business are now, and have
been for years, carried on, both in England and this country,

which were entirely unknown and unheard of when the common law was adopted, and which are now absolutely necessary in conducting the business of the country in a prosperous manner, and to secure to the people the benefits of their enterprise and ability, resulting from the inventive genius of our citizens; and for the protection of such business and such enterprises, it has been found necessary to make laws and regulations providing penalties for infringements upon and injuries thereto, of various grades, including misdemeanors, breaches of the peace, and crimes amounting to felonies. Many kinds of business, even recognized and regulated by the common law, are now carried on in a manner and to an extent then never contemplated, and the dangers arising therefrom to the public have correspondingly increased, and to that extent that it has become absolutely necessary, in order to protect society against these excesses, to inflict penalties and forfeitures upon the offender commensurate with the offense, not only in excess of those recognized by the common law, but in some cases unknown to it. This is especially noticeable in the regulations of the business of vending intoxicating liquor.

It is the common knowledge of mankind that frequent quarrels, violence, and crime are induced by the excessive use of intoxicating liquor in places where it is kept and sold. And it is impossible to say that, when such places are kept open in the night-time until after peaceable citizens have retired to rest, it is not a breach of the peace in fact, and is no less such when made so by law. And when the offense is observed by those charged with the duty of maintaining the peace and enforcing the law, and who may serve process, I have no doubt of their power to make the arrest of the offender without process, and I cannot therefore hold the seventeenth section of the act objectionable in that regard. The power to arrest without warrant has always existed in criminal cases when the offender is seen committing the crime.

Without this power justice would frequently be evaded by reason of the escape of the criminal, or the failure to identify the person. I never have understood that actual violence was necessary to constitute a breach of the peace, but that any means used causing disquiet, disorder, and threatening danger and disaster to the community is equally sufficient to constitute the offense; and it may be questioned both upon reason and authority whether, in criminal cases arising to the grade of breach of the peace, due process of law ever required that process should issue before making the arrest of the peace-breaker.

If it be urged as a reason why it should not be allowed that in such cases there is great danger of being injured in reputation and property beyond possibility of redress, by reason, it may be, of the irresponsibility of the officer making the arrest, that danger certainly is much greater in the higher grades of crime than in the lower, and no one pretends that such arrests are not necessary and proper in the latter cases· It is true, in a criminal case, due process of law means that no citizen of the republic can be deprived of his liberty or his property without trial before a properly constituted judicial tribunal, and a decision upon the rights of the matter, as determined under the laws establishing the right, according to the course, mode, and usages of the common law for the purpose.

This does not, however, necessarily include the manner the offender shall be brought before the court when the charge is made against him, if a speedy trial is accorded him. It is the substance of the right which is to be preserved, and which the Legislature cannot take away, and not the mere manner of reaching it, as I understand the law. The rule is that an arrest without process may always be justified in those cases where public security requires it; and this is clearly the result of our own decisions hereinafter referred to, and no other can be adopted with safety to the community.

I do not think the penalties imposed by the act, or the imprisonment for its violation provided, are in conflict with the provisions of the Constitution, either State or National. A reasonable discretion is vested in the court imposing them. The punishments under the act range from a fine of 6 cents and costs of prosecution to $500 and imprisonment from 10 days to 6 months.   Either or both may be imposed; and for some violations of the act the offender may be made to forfeit the right to sell liquor, and the tax remaining unearned paid by him to the end of the year.   There is nothing oppressive or unusual in the fine and imprisonment that may be imposed, and certainly a disability to do a business for a limited time, which it is lawful to entirely prohibit, is not excessive punishment, and I venture no authority, ancient or modern, can be found to assert a contrary doctrine.

I am aware that it has been decided that it is not competent, in the punishment of a common-law offense, to inflict fine and imprisonment without limitation, and that indefinite punishments are fraught with danger, and ought not to be admitted unless authorized by the written law.   But I am not prepared to say with my Brother CAMPBELL that "a penalty is excessive which seriously impairs the capacity of gaining a business livelihood," nor am I prepared to admit that "any fine or forfeiture is unusual which has not some limitation of value," or that "any punishment is unusual which forfeits any civil rights."

The criminal law cannot be effectually administered at the present time under our Constitution, without to some extent, in most cases, having the effect to include one or more of these.

It must be remembered that criminal law of any grade is made to restrain and punish the law-breaker and not the law-abiding, and, as administered at the present day in this country, its talons are seldom found resting heavily upon the innocent.

It is said by an eminent jurist:[1]

"This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state.   According to the maxim, ' Enjoy your own property in such a manner as not to injure that of another,' which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others.    *    *    * By this general police power of the state, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health, and prosperity of the state, of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be, made, so far as natural persons are concerned."

The right to exercise this power is inherent in the people in every free government.   It is not a grant derived from or under any written constitution.   Without the Constitution the right in the people exists, and they have full power over the whole subject.   The right of the Legislature to exercise the police power of the State is to the State the same as the law of self-defense to an individual.   It exists for the same reason, can be exercised for the same purposes, to the same extent, and is derived from the same source.   The Constitution places but few limitations or restraints upon the exercise of that power by the Legislature, and it would seriously impair its usefulness if it were otherwise.   The power can only assert itself against the law-breaker by fines, penalties, forfeitures, and imprisonments, and in my judgment a court should pause long and consider well the action by the Legislature in establishing them, before it will say those fixed by its enactments are so far in excess of what is necessary to furnish the protection desired as to be obnoxious to the Constitution, which forbids "cruel and unusual punishments;" and, as I have already said, I find nothing in the act under

---

[1]Redfield, C. J., in *Thorpe v. Railroad Co.*, 27 Vt. 140, 149.

consideration in its seventh section approaching the limitations of the Constitution upon this subject.

The following authorities I find very largely supporting the views I have herein taken of these cases, as well as many others cited by counsel on both sides: *Way's Case*, 41 Mich. 304 (1 N. W. Rep. 1021); *Drennan v. People*, 10 Id. 169; *Quinn v. Heisel*, 40 Id. 576; *Doran v. Phillips*, 47 Id. 230 (10 N. W. Rep. 350); *Ross v. Leggett*, 61 Id. 445 (28 N. W. Rep. 695); *Davis v. Burgess*, 54 Id. 514 (20 N. W. Rep. 540); *People v. Haley*, 48 Id. 495 (12 N. W. Rep. 671); *People v. Burt*, 51 Id. 199 (16 N. W. Rep. 378); *Main v. McCarty*, 15 Ill. 441; *Bryan v. Bates*, Id. 87; Cooley, Torts, 176; *Ward v. Green*, 11 Conn. 456; *McCullough v. Com.*, 67 Penn. St. 32; *In re Powers*, 25 Vt. 261; *Mayo v. Wilson*, 1 N. H. 53; *Com. v. Hastings*, 9 Metc. 259; *Taylor v. Strong*, 3 Wend. 385; 2 Cooley, Bl. 243; 4 Id. 244; *Cahill v. People*, 106 Ill. 621; *Roberts v. State*, 14 Mo. 138; *White v. Kent*, 11 Ohio St. 550; *Spalding v. Preston*, 21 Vt. 9; Bac. Abr. Const. Cas.; *Williams v. State*, 44 Ala. 41; *Jones v. Root*, 6 Gray, 435; *State v. Miller*, 94 N. C. 904; *O'Kane v. State*, 69 Ind. 183; *Com. v. Costello*, 133 Mass. 192; *Com. v. Casey*, 134 Id. 194; *State v. McCann*, 59 Me. 383; *Mason v. Lothrop*, 7 Gray, 354; *Bartemeyer v. Iowa*, 18 Wall. 129; *Beer Co. v. Massachusetts*, 97 U. S. 25; *Shultz v. Cambridge*, 38 Ohio St. 659; Cooley, Const. Lim. 211–216; 2 Story, Const. § 1904; *Pervear v. Com.*, 5 Wall. 475; *Barker v. People*, 3 Cow. 686.

In applying the constitutional provisions to the law in question, for the purpose of ascertaining whether it is in conformity therewith, it becomes our duty to give them a reasonable construction with a view to give the law effect; and in so doing we must not lose sight of the fact that if some of its provisions are inconsistent, or even in violation of what we may deem sound political principles, but which do not infringe the Constitution, they cannot be declared void upon

that ground. *People v. Mahaney*, 13 Mich. 481; *People v. Gallagher*, 4 Id. 244; *People v. Common Council*, 29 Id. 108.

For the reasons above stated I concur in the result reached by my Brother CAMPBELL, but prefer to leave the other questions discussed by him for consideration when a proper case shall arise making such discussion necessary.