# CHARLESTON.

GENNARO MARCUCHI v. NORFOLK AND WESTERN RAILWAY CO.

Submitted January 15, 1918.    Decided January 29, 1918.

1. TRIAL—*Withdrawal and Substitution of Instructions—Reversible Error.*

The withdrawal of correct and proper instructions after submission of a case to a jury whose members entertain conflicting opinions upon controverted facts as to which litigant is entitled to a verdict and the substitution of instructions based upon a different and erroneous theory plainly is prejudicial and reversible error.    (p. 550).

2. ARREST—*Warrant—Power of Conductor.*

A conductor as a conservator of the peace has authority, under sec. 31, Ch. 145, Code, to arrest without a warrant and eject from a car or train of cars conveying passengers any person, whether

a passenger or not, who in his presence and the presence of other passengers and the public then assembled contends with angry words to the disturbance of the public peace and tranquility. And an instruction that tells the jury a conductor has no such right is erroneous. (p. 551).

3. BREACH OF THE PEACE—*Definition.*

The phrase "breach of the peace" is generic and includes every act of violence which tends to disturb that sense of security which every person feels necessary to his comfort and to secure which government is instituted and maintained. (p. 553).

Error to Circuit Court, McDowell County.

Action by Gennaro Marcuchi against the Norfolk & Western Railway Company. Judgment for plaintiff, and defendant brings error.

*Reversed and remanded.*

*Theodore W. Reath, John H. Holt, Graham Sale* and *John Randolph Tucker,* for plaintiff in error.

*Arthur G. Froe* and *Harry J. Capehart,* for defendant in error.

LYNCH, JUDGE:

Deeming itself prejudiced by the refusal of instructions requested, the giving in lieu thereof of instructions prepared by the court, the withdrawal of the latter from the jury after submission and partial consideration of the case, among whose members there was disagreement for whom they should find, and the substitution of other instructions for those withdrawn, the defendant seeks reversal of the judgment against it rendered in an action for an alleged false arrest by the agents and servants of the defendant while engaged in the discharge of the duties assigned to them and while plaintiff was a passenger on defendant's line of railroad. He had purchased a ticket entitling him to carriage from Pocahontas, Virginia, to Bluestone Junction, where a change of trains was necessary, and thence to Dry Fork, McDowell County, West Virginia. The contract of carriage being performed as far as the junction, the plaintiff, on the arrival of the train bound for his destination, twice attempted to force his way

into one of the coaches while the vestibule, platform and steps were occupied by passengers in the act of alighting. Though upon the first effort requested by the conductor to desist until the passage way was free of obstruction, plaintiff persisted in the attempt, when the conductor stopped and detained him on the steps or platform of the car and directed the retiring passengers to depart by way of the platform and steps of the next coach, when plaintiff began and continued to use loud, vulgar, obscene and profane language in the presence of the conductor, of Thompson, a police officer and employee of the defendant, and of other passengers and the public assembled on and about the railroad platform and premises, wherefore the arrest ensued. That plaintiff used the language attributed to him is proved not only by the agents of the defendants but also by others who witnessed the occurrence, heard what he said and saw what he, the conductor and Thompson did, though he and two others of the same nationality denied the disorderly conduct and offensive language charged and testified that the conductor assaulted, beat and wounded him.

Of the instructions requested by defendant, 1, 2 and 6 state correct legal principles and should have been given but 3, 4 and 5 do not and properly were refused; No. 3 because it says the conductor had authority to arrest the plaintiff for the violation of the rules and regulations prescribed by the defendant for the guidance of its agents and servants in the transaction of its business. Carriers possess no power to enact statutes the violation of which subjects the offender to such treatment; No. 4 because substantially covered by No. 1 requested but not given. Besides, the phrase ''or by other act or acts'' is too general and is susceptible of misinterpretation. No. 5 is objectionable only because although plaintiff may not be entitled to recover for the arrest he may be entitled to damages for an assault under the pleadings if unnecessary force was used to effect the arrest.

Barring the direction as to exemplary damages, the instructions first propounded by the court ex mere motu and later withdrawn state correct legal principles when applied only to the contention of the plaintiff. They conceded, how-

ever, to the jury the right to determine whether upon the
facts proved the arrest was justifiable. The substituted in-
structions withdrew this question from the jury and told them
that the defendant's servants and agents had no right under
the law to arrest the plaintiff without a warrant and that,
therefore, the arrest made was such as rendered defendant
responsible; and left for them nothing but the assessment of
damages.

If, when applied to the facts testified to by defendant's
witnesses, the principle asserted in these instructions is sound,
a conductor, though acting within the scope of his employ-
ment, cannot arrest for a misdemeanor committed in his
presence and in the presence of the public without first pro-
curing a warrant therefor, however offensive may be the acts
and conduct of the guilty offender. If that be true of course
the action of the court was not erroneous.

First, was plaintiff under any aspect of the case guilty of
a misdemeanor? Section 31, Ch. 145, Code, says: "If any
person, whether a passenger or not shall, while on any pas-
senger car or any train of cars, behave in a riotous or dis-
orderly manner, he shall be guilty of a misdemeanor" for
which he may be fined and imprisoned and ejected from such
car or train "by the person or persons in charge thereof".
It also authorizes the conductor, flagman and brakeman in
charge of, or employed on, such car or train to exercise all
the powers of a conservator of the peace while in the service
of the carrier, provides for the appointment and qualification
of special police officers, such as was Thompson, upon the ap-
plication of the carrier and confers upon them the right to
"exercise" all such "powers and authority * * * as may
be vested in or conferred upon the regularly elected or ap-
pointed constable" in the county in which the appointee re-
sides and in every other county through which the whole or
any part of such railroad extends, if he has filed therein a
copy of the oath required of him as such officer. Besides,
section 7, Art. IX., Const., declares "every justice and con-
stable shall be a conservator of the peace throughout his
county". To the powers so conferred is added this that a
constable as such conservator may arrest without a warrant

any person who in his presence shall engage in an affray, threaten to beat, wound or kill, commit violence, contend with angry words to the disturbance of the peace or appear in a state of gross intoxication in a public place. Sec. 9, Ch. 153, Code.

But these statutes simply put into tangible and concrete form the common law definition of that which when done in public constitutes a misdemeanor: for the use of indecent language or opprobrious epithets in public hearing has long been held to be an offense, "because fraught with great danger to the public morals over which the common law always stands guard." 14 Enc. Pl. & Pr. 1152. To prevent or lessen the danger a conservator has, where the common law prevails, always possessed ample powers to apprehend persons guilty of misdemeanors where the offense was committed in his presence in a public place.

A conservator is defined as one whose duty requires him to prevent and arrest for breaches of the peace in his presence, but not to arraign and try for them. 8 Cyc. 586. The office was created by an act of parliament passed in the reign of Edward III., which ordained "that in every shire of the realm good men and lawful which were no maintainers of evil nor barrators in the county, should be assigned to keep the peace * * * to repress all intention of uproar and force even in the first seed thereof and before that it should grow up to any offer of danger." 1 Edward III., Ch. 15; 2 Hale P. C. Ch. 7, Note 1; *In re Baker*, 56 Vt. 1, 20. Such persons at first possessed no powers other than to maintain the public peace and tranquility of the realm. Gradually, however, their powers were enlarged in the same reign and they came to constitute a very important agency in the administration of local government, and in 34 Edward III., Ch. 1 were invested for the first time with judicial powers and were commissioned by the king. Thus it appears that the creation of purely peace officers as conservators of the peace antedated the creation of the office of justice of the peace who later were endowed with the right to exercise the functions now possessed and exercised by the latter.

The authority to suppress disturbances, quell riots and re-

press the commission of offenses when publicly attempted in the presence or the view of such conservators necessarily implies the right to intervene and intercept without the delay incidental to the procurement of a warrant. In *Baynes* v. *Brewster*, 2 Q. B. 375, 114 Reprint 149, 153, a decision involving the liability of a constable for the suppression of an affray not in his presence and after it had ceased, Williams, Judge, said that while "no principle is more generally assumed than that a warrant is necessary to entitle him to interfere after any affray is over, it is otherwise where the facts show that the affray is practically going on."

There can be no doubt that an officer upon whom legally devolves the duty to preserve the public peace may without a warrant apprehend any person who is in the act of committing or has committed a public offense in his presence, if it be a misdemeanor, and he may sometimes also likewise arrest for a felony not committed in his presence if he has just cause to believe such an offense has recently been perpetrated. *Jones* v. *State*, 100 Ala. 88; *People* v. *Nihell*, 144 Cal. 200; *McDuffie* v. *State*, 121 Ga. 580; *Cahill* v. *People*, 106 Ill. 621; *State* v. *Carpenter*, 54 Vt. 551. See also numerous apt decisions cited in note 5 C. J. 407 as to the right to arrest for misdemeanors. In *State* v. *Clark*, 64 W. Va. 625, Judge MILLER discusses the same subject substantially involving the identical language, though perhaps more profane, and reaches the same conclusion as to the right to arrest without a warrant.

The phrase "breach of the peace" has a wide and general application and meaning and comprehends disturbances of the public peace violative of order and decency or decorum; it signifies the disquieting of the public tranquility by any act or conduct inciting to violence or tending to provoke or excite others to break the peace or cause consternation or alarm. As defined in *State* v. *Coffin*, 64 Vt. 25, and *State* v. *Archibold*, 59 Vt. 548, public peace is "that invisible sense of security which every person feels and which is necessary to his comfort and for which government is instituted." So that when this sense of security is disturbed by disquiet, violence or profanity an offense at the common law is com-

mitted. 9 C. J. 386; *U. S.* v. *Hart,* 26 Fed. Cas. No. 15,316; *Delk* v. *Com.,* 166 Ky. 39.

Without repeating in detail the language used by the plaintiff when detained by the conductor on the platform of the railroad coach, as testified by the witnesses for the defendant, it is sufficient to say there was a conflict such as under our procedure was for jury determination. If in their opinion it was of a character to bring it within the scope and range of the legal principles enunciated, and was sufficient to constitute a misdemeanor as for a breach of the peace, tranquility and quietude of such part of the passengers and general public then assembled, the conductor had authority and it was his duty to make the arrest without a warrant; and this was a question properly submitted to the jury in the first instance and erroneously withdrawn from them in the second. That there was such a conflict there can be no reason to doubt. Linkous, the conductor, in charge of the train, and Thompson, the special officer appointed and commissioned under sec. 31, Ch. 145, testify to the opprobrious epithets, profane and vulgar language used and they are corroborated by Parsons, who did not participate and had no interest in the transaction. Their testimony is contradicted by plaintiff, who is corroborated by two others of the same nationality, one of whom admitted he did not understand the language used and the third heard no offensive language though standing but six feet away.

But if there were no conflict, the instructions were improperly given for another reason. It is not correct to say that a jury may include in the verdict exemplary or punitive damages in addition to damages they may find to be sufficient to compensate for an injury inflicted and feelings wounded. This court has recently twice stated the true rule to be that exemplary damages may be allowed properly only when the jury may deem the compensation fixed insufficient to deter defendant and others from engaging in like conduct when actuated by wantonness or passion. The reasons for the exception are stated so fully and aptly in *Allen* v. *Lopinsky,* 94 S. E. 369,

and *Hess* v. *Marinari,* decided January 22, 1918, that repitition is not required.

We therefore reverse the judgment and remand for new trial.

*Reversed and remanded.*