507 S.E.2d 376

STATE of West Virginia ex rel. Stan
FARLEY, Sheriff of Putnam
County, Petitioner,

v.

Honorable O.C. SPAULDING, Judge of the
Circuit Court of Putnam County, and
the County Commission of Putnam
County, Respondents.

No. 24965.

Supreme Court of Appeals of
West Virginia.

Submitted April 28, 1998.

Decided July 14, 1998.

Concurring Opinion of Justice Workman
July 20, 1998.

Dissenting Opinion of Chief Justice Davis
July 22, 1998.

Concurring Opinion of Justice Starcher
Nov. 9, 1998.

Davis, C.J., filed dissenting opinion.

Workman and Starcher, JJ., filed separate concurring opinions.

---

Claude S. Smith, III, G. Wayne Van Bibber, Smith & Van Bibber, Charleston, West Virginia, Attorneys for Petitioner.

John M. Hedges, Byrne & Hedges, Morgantown, West Virginia, Attorney for Amicus Curiae, West Virginia Judicial Association.

Ancil G. Ramey, Steptoe & Johnson, Charleston, West Virginia, Attorney for Respondent Judge.

Franklin L. Gritt, Jr. Winfield, West Virginia, Attorney for Respondent County Commission.

McCUSKEY, Justice:

In this original proceeding in prohibition, the petitioner, Stan Farley, Sheriff of Putnam County, petitions this Court to issue a writ of prohibition preventing the Honorable O.C. Spaulding, Chief Judge of the Circuit Court of Putnam County, from enforcing two administrative orders which he entered on August 26, 1997. Pursuant to the judge's orders, nine individuals, who had been hired by the Putnam County Commission to perform court security functions for the county's judiciary, were designated as court marshals and granted certain powers and duties.

Sheriff Farley attacks the administrative orders as unconstitutional and an impermissible usurpation of his statutory power under *W.Va.Code* § 51–3–5 (1923). On the other hand, the respondents, Judge Spaulding and the Putnam County Commission, assert that the challenged orders are constitutionally valid and, further, that *W.Va.Code* § 51–3–5 (1923) does not preclude the respondent county commission's employment of court security officers, whose responsibilities go beyond merely attending court proceedings. In addition, the respondents contend that the West Virginia Constitution has vested in circuit judges, and particularly in chief circuit judges, the power to regulate courthouse security and to employ the necessary personnel to perform court security functions. For reasons explained below, we find that the West Virginia Constitution and laws of this State support both sides. Accordingly, we grant, in part, and deny, in part, the writ of prohibition.

## I.

### FACTUAL BACKGROUND

The new Putnam County Judicial Building opened in August of 1997. The facility was constructed by the Putnam County Commission and equipped by the commission with state-of-the-art security devices, including a metal detector, x-ray machine, video monitoring equipment, and remote-controlled electronic door locks. The building houses the Putnam County judiciary, including two circuit judges, three magistrates, and the family law master, as well as the circuit clerk, the magistrate clerk, the probation department, and the prosecuting attorney.

The planning of the new judicial building included the consideration of adequate court security personnel requirements. Discussions transpired regarding the court security personnel necessary to ensure the security needs of the facility. Among the participants in these discussions were representatives of the county judiciary, the county commission, and the sheriff's office. Their evaluation of security needs took place against the backdrop that in fiscal year 1996–1997, Sheriff Farley had assigned only one full-time deputy sheriff to serve as bailiff for the county's six judicial officers and family law master.

In order to provide efficient and effective court security services for the new facility, the county commission and the county judiciary undertook a collaborative effort to staff the building with properly trained civilian security officers. Sheriff Farley was informed of the court security program that was being developed by the commission and county judiciary. While there is some dispute as to whether Sheriff Farley endorsed the use of civilian security officers, affidavits of the respondent judge and Linda K. McClanahan, administrative assistant to the county commission, indicate that the sheriff did express support for an aspect of the overall plan which involved returning to law enforcement activities the one deputy sheriff who had been assigned to bailiff services. It also appears from the record that the county commission met with Sheriff Farley on May 21, 1997, to discuss the selection of the Court Marshal; that the sheriff was told of the three individuals under consideration for the position; and that he expressed his preference for Douglas Ratliff, who was eventually selected for the job.

On June 18, 1997, the county commission entered an order adding Douglas Ratliff to the county payroll, effective June 30, 1997. On August 20, 1997, the commission entered an order placing eight persons, selected by Mr. Ratliff to serve as Deputy Court Marshals on the county payroll, effective that day.

On August 26, 1997, Judge Spaulding issued the two administrative orders which are now in dispute. The first order provided as follows:

WHEREAS, Article VIII of the Constitution of West Virginia provides for the Supreme Court and its Circuit Courts to appoint their officers and employees; and

WHEREAS, adequate security is necessary to assure the safe, secure and peaceful conduct of a circuit court's business; and

WHEREAS, the Circuit Court of Putnam County, West Virginia, has determined that a full-time position for a qualified Court Marshal is necessary for adequate security in the conduct of the court's business; and

WHEREAS, the Putnam County Commission has employed Douglas M. Ratliff to assist this Court in its responsibility of providing the public and employees a safe, secure and peaceful environment in the Putnam County Judicial Building; and

WHEREAS, the Chief Judge of the Circuit Court of Putnam County, West Virginia, has determined that Douglas M. Ratliff is qualified by training and experience to be the Court's Marshal;

NOW, THEREFORE, IT IS **ORDERED**, that Douglas M. Ratliff, an employee of the Putnam County Commission, is hereby designated by the Chief Judge of the Twenty–Ninth Judicial Circuit as Court Marshal for the Circuit Court of Putnam County, to serve at the will and pleasure of the Chief Judge thereof;

**IT IS FURTHER ORDERED** that the Court Marshal may utilize Deputy Court

Marshals employed by the Putnam County Commission to assist the Court Marshal and that said Deputy Court Marshals shall have the same powers and authority as the Court Marshal in carrying out their duties; Provided, that said Deputy Court Marshals shall be properly trained, qualified, approved and appointed by this Court to serve at the will and pleasure of the Chief Judge thereof.

**IT IS FURTHER ORDERED** that the Court Marshal and Deputy Court Marshals are authorized to:

1. perform the services of court bailiff including assuring the security for all court proceedings;

2. escort prisoners to and from court proceedings;

3. make arrests in and around the Putnam County Judicial Building and the Putnam County Courthouse for offenses committed in their presence or in the presence of the Court;

4. carry a concealed firearm or other deadly weapon upon their person in the Putnam County Judicial Building and the Putnam County Courthouse; and

5. use reasonable and necessary force, including deadly force, in the exercise of their responsibilities and duties.

The second order designated eight individuals to serve as Deputy Court Marshals for the Circuit Court of Putnam County. As of March 4, 1998, a Court Marshal, two full-time Deputy Court Marshals, and six part-time Deputy Court Marshals were employed by the county commission to serve the county judiciary.

In connection with this litigation, the respondent judge conducted a survey of the other judicial circuits in West Virginia in order to ascertain whether any of them use "civilian bailiffs." This survey revealed that circuit courts in eleven counties use civilian bailiffs to some degree. In some of these counties, the civilian bailiffs are employees of the sheriff. In other counties, they are employees of the county commission.

## II.

## STANDARD OF REVIEW

The standard of review upon a petition for writ of prohibition was articulated by this Court in Syllabus Point 1 of *State ex rel. W.Va. Fire & Casualty Co. v. Karl,* 199 W.Va. 678, 487 S.E.2d 336 (1997):

" ' "In determining whether to grant a rule to show cause in prohibition when a court is not acting in excess of its jurisdiction, this Court will look to the adequacy of other available remedies such as appeal and to the over-all economy of effort and money among litigants, lawyers and courts; however, this Court will use prohibition in this discretionary way to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance." Syllabus Point 1, *Hinkle v. Black,* 164 W.Va. 112, 262 S.E.2d 744 (1979).' Syllabus Point 12, *Glover v. Narick,* 184 W.Va. 381, 400 S.E.2d 816 (1990)." Syllabus Point 1, *State ex rel. Doe v. Troisi,* 194 W.Va. 28, 459 S.E.2d 139 (1995).

*See also* Syl. Pt. 1, *State ex rel. U.S. Fidelity and Guar. Co. v. Canady,* 194 W.Va. 431, 460 S.E.2d 677 (1995). In addition, we review questions of law and statutory interpretations *de novo.* Syl. Pt. 1, *Chrystal R.M. v. Charlie A. L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995).

## III.

## DISCUSSION

The issue before this Court is two-fold: Does a county commission have the authority to employ individuals to perform court security functions for the county's judiciary, and, if so, does a circuit court judge have the power to authorize those persons to provide security in the conduct of the court's business, including the performance of the duties of court bailiff? In order to resolve these questions, we must examine the pertinent constitutional and statutory provisions which

give rise to the various duties and powers in this case.

### A. The Powers and Duties of the Circuit Court

Article VIII, Section 6 of the West Virginia Constitution provides, in relevant part:

Circuit courts shall also have such other jurisdiction, authority or power, original or appellate or concurrent, as may be prescribed by law. Subject to the approval of the supreme court of appeals, each circuit court shall have the authority and power to establish local rules to govern the court. Subject to the supervisory control of the supreme court of appeals, each circuit court shall have general supervisory control over all magistrate courts in the circuit. Under the direction of the chief justice of the supreme court of appeals, the judge of the circuit court, or the chief judge thereof if there be more than one judge of the circuit court, shall be the administrative head of the circuit court and all magistrate courts in the circuit.

The language contained in Article VIII, Section 6 is a part of the 1974 Judicial Reorganization Amendment to the West Virginia Constitution, which rewrote the constitutional powers and duties of our state's judicial branch of government.[1] "The overriding purpose behind the passage of the Reorganization Amendment was to provide a unified court system in West Virginia to facilitate the prompt and efficient administration of justice." *State ex rel. Lambert v. Stephens,* 200 W.Va. 802, 807–08, 490 S.E.2d 891, 896–97 (1997) (citing *State ex rel. Bagley v. Blankenship,* 161 W.Va. 630, 634, 246 S.E.2d 99, 102 (1978)). To that end, the Reorganization Amendment vested the judicial power of the State "solely" in this Court and its inferior courts and created "a hierarchy to be used in resolving administrative conflicts and problems." *State ex rel. Frazier v. Meadows,* 193 W.Va. 20, 28, 454 S.E.2d 65, 73 (1994); *see* W.Va. CONST. art. VIII, § 1.

The administrative structure established by the Reorganization Amendment has been analyzed by this Court. In *Frazier, supra,*

we noted that "[t]he Reorganization Amendment essentially made the Chief Justice of the Supreme Court the administrative head of all courts. Significantly, the administrative power vested in the Chief Justice of the Supreme Court also flows to the lower court judges." 193 W.Va. at 28, 454 S.E.2d at 73; *see* W.VA. CONST. art. VIII, § 3. We elaborated upon this structure in *Lambert, supra,* where we discussed the provisions of the Amendment which vest administrative power in the circuit courts. We stated in *Lambert, supra,* that

[t]he drafters of the Reorganization Amendment implicitly recognized, however, that this Court can neither make nor micro-manage every administrative decision that needs to be made at the local level. Thus, Article VIII, Section 6 of the West Virginia Constitution provides that, subject to control by this Court, a circuit court judge, or a chief circuit judge in a multi-judge circuit, is given the power to control local affairs. *See Rutledge,* 175 W.Va. at 381, 332 S.E.2d at 837; Syl. Pt. 2, *Carter v. Taylor* [180 W.Va. 570, 378 S.E.2d 291 (1989)]. In addition, this section also gives the circuit court judge, or the chief judge thereof, the "general supervisory control over all magistrate courts...." W. Va. Const. art. VIII, § 6.

200 W.Va. at 808, 490 S.E.2d at 897 (footnotes omitted).

In *State ex rel. Skinner v. Dostert,* 166 W.Va. 743, 278 S.E.2d 624 (1981), we interpreted Article VIII, Section 6, together with relevant language contained in Article VIII, Section 10, as follows:

The plain and apparent meaning of these sections is that the circuit court may exercise the administrative powers necessary to "secure the convenient and expeditious transaction of ... business". The operative phrases are "supervisory control", "administrative head", "division of business", and "convenient and expeditious transaction of such business". These operative phrases describe functions executive in nature. In essence, the language of article 8,

---

**1.** The Reorganization Amendment rewrote Article VIII, substituting Secs. 1 to 15 for former Secs. 1 to 30, amended Sec. 13 of Article III, and added Secs. 9 to 13 to Article IX.

sections 6 and 10 are the grants of executive power within the judiciary.

*Id.* at 759, 278 S.E.2d at 635.

Recently, in *Lambert, supra,* this Court made a fundamental inquiry concerning the separation of powers doctrine and the scope of a court's inherent authority to require sufficient resources for it to perform its functions. With regard to the separation of powers doctrine, we stated:

> As part of our constitutional democracy on both the national and state level, we ascribe to the principle that there shall be three equal branches of government—legislative, executive, and judicial. Article V, Section 1 of the West Virginia Constitution states, in part: "The legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others...." W.Va. Const. art. V, § 1. These "separate and distinct" branches of government fulfill the essential function of "checks and balances."

*Lambert,* 200 W.Va. at 809, 490 S.E.2d at 898. As we held in Syllabus Point 2 of *Lambert, supra,* "[n]ot only does our Constitution explicitly vest the judiciary with the control over its own administrative business, but it is a fortiori that the judiciary must have such control in order to maintain its independence." Moreover, regarding a court's inherent power to require resources for the performance of its responsibilities, we held in Syllabus Point 3 of *Lambert, supra:*

> 3. Courts have inherent authority to require necessary resources, such as sufficient funds for operating expenses, work space, parking space, supplies, and other material items. In order for a court to invoke use of its inherent power to require resources, the court must demonstrate that such resources are reasonably necessary for the performance of its responsibilities in the administration of justice. Although courts must be cautious not to reach beyond the power of the judicial branch, it is crucial for the judiciary to be able to invoke such power as is reasonably necessary to maintain itself as an independent and *equal* branch of our government.

Ancillary to this inherent administrative power, we recognized a court's right to utilize legal resources in aid of its administrative functions whenever a conflict arises between the judiciary and another branch of government and an amicable solution cannot be found. *Lambert,* 200 W.Va. at 811, 490 S.E.2d at 900. In Syllabus Point 5 of *Lambert, supra,* we held that "[a] court may use the legal resources available to it to defend those interests it is constitutionally bound to protect, including, but not limited to, ex parte orders in necessary circumstances in administrative matters within the court's inherent authority."

More specifically, with regard to the issue now before us, this Court has emphasized "[t]he inherent power that courts possess to provide for necessary attendants in order to perform their constitutional duties." *In re Pauley,* 173 W.Va. 228, 233, 314 S.E.2d 391, 396 (1983) (citing relevant cases from other jurisdictions). While this Court has not previously addressed the validity of a court's use of its inherent administrative power in order to ensure adequate security for a courthouse, this issue was decided by the Supreme Court of Colorado in *Board of County Comm'rs. v. Nineteenth Judicial Dist.,* 895 P.2d 545 (Colo.1995). In that case, in response to threats of courthouse violence, the chief judge of a judicial district met with the board of county commissioners and the county sheriff to discuss methods for providing a safe and secure courthouse environment. *Id.* at 547. After several discussions among these parties, the chief judge entered an order requiring that the sheriff provide security for the courthouse and specifying that the board pay the costs of the security equipment and personnel. *Id.* The Colorado court upheld that part of the chief judge's order which required the sheriff to provide security under the "inherent powers doctrine." Ultimately finding that the directive was a proper exercise of the court's inherent authority, the court reasoned:

> [T]he Chief Judge properly ordered security to ensure the continuing viability of the courts. Without security the public's confidence in the integrity of the judicial system is threatened. The proper administration of justice requires that courts op-

erate in a safe and secure environment. When society views the security of the court system with skepticism, the authority of the judicial branch is diminished. A weak judicial branch prevents a proper functioning of the tripartite scheme of government. The Chief Judge properly ordered security so the courts may continue to fulfill their constitutional mandate and administer justice in an orderly and dignified atmosphere.

*Id.* at 548–49.

## B. The Powers and Duties of the Sheriff

*West Virginia Code* § 51–3–5 (1923) provides that

[t]he supreme court of appeals shall not be attended by any sheriff, but every circuit court, county court, and other court of record of any county shall be attended by the sheriff of the county in which it is held, who shall act as the officer thereof.

In addition, Rule VII of the West Virginia *Trial Court Rules* (1960) mandates:

The sheriff, or a deputy, shall be present at all times while the court is in session. The sheriff shall provide a sufficient number of deputies to maintain order in the courtroom at all times. The rules and orders of the court pertaining to conduct in the courtroom shall be enforced by him or them.

The provisions of *W.Va.Code* § 51–3–5 and Rule VII of the *Trial Court Rules,* set forth above, were interpreted by this Court in *Frazier v. Meadows, supra.* We concluded in *Frazier* that § 51–3–5 and Rule VII charge the sheriff of a county with the duty of providing bailiffs for the county circuit court. In addition, we found that § 51–3–5 confers authority on the sheriff to select and assign one or more deputy sheriffs to serve as court bailiff. 193 W.Va. at 26–28, 454 S.E.2d at 71–73. As a necessary corollary to this duty and authority, we recognized that under § 51–3–5 and Rule VII, the sheriff has the further responsibility of "maintaining a sufficient number of deputies for the court." 193 W.Va. at 24, 454 S.E.2d at 69.

■ "We have defined a bailiff as "[a] court officer or attendant who has charge of a court session in the matter of keeping order, custody of the jury, and custody of prisoners while in the court." " *Frazier,* 193 W.Va. at 28, 454 S.E.2d at 73 (quoting *Pauley,* 173 W.Va. at 233, 314 S.E.2d at 396). Additionally, in Syllabus Point 2 of *Pauley, supra,* we held that "[a] bailiff is an officer of the court to which he or she is assigned, subject to its control and supervision, and responsible for preserving order and decorum, taking charge of the jury, guarding prisoners, and other services which are reasonably necessary for the court's proper functioning." Moreover, in *Frazier, supra,* we stated:

The bailiff, as an officer of the court, nevertheless, falls within the administrative hierarchy set up by the Reorganization Amendment. We underscore the point that ministerial attendants such as clerks and bailiffs, regardless of the method of their selection, fall within the administrative control of the court system. Judges are ultimately responsible for any action or inaction of their employees and only a judge can determine whether his assistants are suitable and sufficient for his needs.

193 W.Va. at 29, 454 S.E.2d at 74.

## C. The Powers and Duties of the County Commission

Article IX, Section 11 of the West Virginia Constitution provides, in pertinent part:

The county commissions.... shall ... under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties....

■ This Court has interpreted this provision, formerly contained in Article VIII, Section 24, as vesting the county commissions of this State with "a wide discretion in the superintendence and administration of the internal police and fiscal affairs of their counties." Syl. Pt. 1, *Meador v. County Court,* 141 W.Va. 96, 87 S.E.2d 725 (1955). Under the relevant language of Article IX, Section 11, we stated in *Hockman v. Tucker County Court,* 138 W.Va. 132, 137, 75 S.E.2d 82, 85 (1953):

The sheriff, though an important law enforcement officer, does not have the complete or the exclusive control of the internal police affairs of the county. By virtue of the quoted constitutional provision the county court has the authority to superintend and administer, subject to such regulations as may be prescribed by law, the police affairs of the county.

Additionally, *W.Va.Code* § 7–3–2 (1989) mandates that

[t]he county commission of every county, at the expense of the county, shall provide at the county seat thereof a suitable courthouse ... together with suitable offices for the judge of the circuit court and judges of courts of limited jurisdiction, clerks of circuit courts, courts of limited jurisdiction and of the county commission, assessor, sheriff, prosecuting attorney, county superintendent of schools, and surveyor, and all other offices as are or may be required by law.... The county commission shall keep the courthouse, jail and other offices in constant and adequate repair, and supplied with the necessary heat, light, furniture, record books, and janitor service, ... and other things as shall be necessary....

Moreover, under *W. Va.Code* § 7–1–3m (1974), the county commission is "empowered to employ, fix compensation for and discharge such ... personnel ... as may from time to time be necessary to aid such courts in exercising their powers or discharging their duties as provided by law."

In *State ex rel. County Court v. Arthur*, 150 W.Va. 293, 297, 145 S.E.2d 34, 37 (1965), this Court noted that

[w]hen a statute imposes upon a county court the duty to perform a particular function, it has the power to so act, together with such powers as are reasonably necessary to perform that function. For example, under the provisions of Code, 1931, 7–3–2, as amended, the county court of each county is charged with the duty to provide and maintain, at the county seat, a courthouse. While no statute expressly authorizes the court to purchase mops and brooms, such authority is implied as a necessary and reasonable incident to the proper maintenance of the courthouse.

## D. The Proper Balance of Powers in This Case

■ As indicated above, the facts in the action before this Court are that the county commission hired nine civilians to serve as security officers at the new Putnam County Judicial Building. Thereafter, the respondent chief judge entered a pair of administrative orders designating one of those persons as Court Marshal and the other eight as Deputy Court Marshals and authorizing all nine civilians to (1) perform the services of court bailiff including assuring the security for all court proceedings; (2) escort prisoners to and from court proceedings; (3) make arrests in and around the Putnam County Judicial Building and the Putnam County Courthouse for offenses committed in their presence or in the presence of the Court; (4) carry a concealed firearm or other deadly weapon upon their person in the Putnam County Judicial Building and the Putnam County Courthouse; and (5) use reasonable and necessary force, including deadly force, in the exercise of their responsibilities and duties. In one of the two orders, which were entered simultaneously, the respondent judge found that "adequate security is necessary to assure the safe, secure and peaceful conduct of a circuit court's business" and that "a full-time position for a qualified Court Marshal is necessary for adequate security in the conduct of the court's business." It is also apparent from the orders that the Deputy Court Marshals were intended to assist the Court Marshal in providing adequate security for the judicial building and its occupants.

Under the circumstances of this case, we find that the county commission's hiring of court security personnel was within its constitutional power to superintend and administer the internal police and fiscal affairs of the county. *See* W.VA. CONST. art. IX, § 11; *Meador, supra; Hockman, supra.* We also believe that the court security officers in question are necessary to the efficient operation of the Putnam County judicial facility with its state-of-the-art security equipment, and, therefore, that the commission had the implied authority to employ them. *See Ar-*

*thur, supra; W.Va.Code* § 7–3–2; *W.Va.Code* § 7–1–3m. We do not find that the commission's employment of these personnel in any way impaired or supplanted the power and duty of the county sheriff under *W.Va.Code* § 51–3–5 and Rule VII of the West Virginia *Trial Court Rules.*

■ In addition, we find that properly trained security officers, whose duties include operating the new facility's security devices, are reasonably necessary in order to ensure adequate security for not just the courtroom but the entire judicial building and its occupants. *See Lambert, supra.* As in *Board of County Comm'rs, supra,* we find that Judge Spaulding had the inherent power to provide adequate court security, which is essential to the safe and orderly administration of justice. However, because the sheriff is both empowered and obligated, under § 51–3–5 and Rule VII, to provide deputies to serve as court bailiffs for all levels of the county judiciary, we find that the respondent judge improperly entered the sheriff's bailiwick to the extent that he authorized the court marshals to perform the courtroom services of bailiff and to escort prisoners to and from court proceedings. *See Frazier, supra; Pauley, supra.* Under the separation of powers doctrine, this Court cannot permit these usurpatory portions of the respondent judge's order to stand.

■ Accordingly, under the facts of this case and the foregoing legal principles, we hold that a county commission has the authority to employ individuals to perform security functions for the county judiciary, but this authority is limited insofar as it cannot properly be exercised in a manner which impairs or supplants the power and duty of the county sheriff, under *W.Va.Code* § 51–3–5 (1923) and Rule VII of the West Virginia *Trial Court Rules* (1960), to select one or more deputy sheriffs to serve as court bailiff and to provide a sufficient number of bailiffs for every court of record in the county. We further hold that the judge of the circuit court, or the chief judge thereof if there is more than one judge of the circuit court, has the inherent administrative power to designate and authorize persons to perform security services necessary to the safe and efficient operation of the county judiciary, provided that such administrative action does not impair or supplant the power and responsibility of the county sheriff to furnish deputy sheriffs to serve as court bailiffs for the county's courts.

Therefore, we grant the writ of prohibition, in part, and prohibit the enforcement of the first two grants of authority contained in the respondent judge's order on the grounds that they are usurpatory of the sheriff's power and duty under § 51–3–5 and Rule VII. Conversely, we conclude that the remainder of the respondent judge's orders constitutes a valid exercise of his inherent administrative powers and, consequently, we deny the writ of prohibition to the extent that it would bar enforcement of those provisions. For example, under our ruling, the court marshals can make arrests in and around the new judicial building and the county courthouse for offenses committed in their presence or in the presence of the circuit court.

## IV.

### CONCLUSION

Upon all of the foregoing, this Court hereby orders that the writ of prohibition is granted, in part, and denied, in part.

*Writ granted, in part, and denied, in part.*

WORKMAN, Justice, concurring:

(Filed July 20, 1998)

I write separately to emphasize two significant caveats to the majority's holding that the county commission has the authority to employ individuals to perform security functions for the county judiciary, so long as they do not supplant or impair the power and duties of county sheriffs. In this regard, county commissions should not conclude that the majority opinion in any way licenses them to create their own force of deputies, or in any way erode the civil service protections to which deputy sheriffs are statutorily entitled. *See* W. Va.Code §§ 7–14–1 to –21 (1993 & Supp.1997). These protections continue to be in force and effect and cannot be abrogated by virtue of the majority's conclusion that

court security can properly be provided by both the sheriff and the county commission.

Although this matter arose in a rather unique factual scenario,[1] a number of other West Virginia sheriffs appeared on the day of oral argument, apparently as a show of support for the assertion of their statutory right to provide court security services. Now that our opinion has clarified the sheriffs' power and authority, it is their attendant and mandatory responsibility to perform those duties and to provide adequate security for the judicial system.

The inadequacy and insufficiency of security in West Virginia's courtrooms has been consistently identified as a major problem, especially in family law master proceedings, where violence is most likely to occur.

In recognition of this problem, the West Virginia Legislature in 1996 created a special fund to be administered by a "court security board," in order to enhance the security of courts in the counties of this State. W.Va. Code § 51-3-14 (1996), et seq. As stated in West Virginia Code 51-3-16(a) (1996): "The sheriff of each county in conjunction with the circuit judges, magistrates and family law masters may develop a security plan to enhance the security of all the court facilities in use in the county and submit said plan to the county security board." Moreover, in 1995, 1996 and 1997, statewide judicial summit meetings were conducted by this Court which included the input of various justices, judges, magistrates and officers of the court with regard to a variety of problems. During each of those meetings, it was determined that court security was one of the most serious concerns facing the West Virginia judicial system. In 1998, the Commission on the Future of the West Virginia Judicial System, which met in lieu of a summit meeting, concerning its information gathering activities. That report also listed court security as one of the most serious concerns of the West Virginia judicial system. We will look to the Commission's final report due in the fall of 1998 for recommendations on how to deal with this problem, but the sheriffs of West Virginia should also be developing plans to perform their statutory responsibility to provide courtroom security throughout West Virginia.

DAVIS, Chief Justice, dissenting:

(Filed July 22, 1998)

Let me be clear. I believe that the courts of our State require heightened security. Fortunately, the courts of our State have not been victimized by some of the tragic incidents that have occurred in courtrooms in other states. Nevertheless, the potential for unlawful conduct to occur in any of our courtrooms is real. Affirmative steps should and must be taken to minimize that potential threat. However, the approach embarked upon by the circuit court and county commission of Putnam County, and affirmed by the majority of this Court, is wrong. I believe that county commissions have the legal authority to unilaterally provide security guards for county courthouses, or any county building for that matter. However, to provide security guards with state police power (i.e., arrest powers, and the authority to use deadly force and to carry firearms) requires statutory authorization by the legislature. As no such statute exists to support the majority opinion in this matter, I must respectfully dissent from the decision rendered by the majority in this case.

The majority's decision has given to circuit courts and county commissions one of the most jealously guarded constitutional powers in our democratic system—police power. The majority opinion allows police, euphemistically dubbed court police, to be created in all fifty-five counties of our State. These police forces are not accountable to the state legislature. The legislature did not authorize their creation. In fact, these police forces are not even accountable to the county sheriff whose constitutional duty it is to provide law enforcement for the county. Instead, they are private police forces controlled by county commissions and circuit courts.

---

1. In Putnam County, a new judicial building with state-of-the-art security features was constructed. The record reflects that the sheriff participated in the planning and apparently at least tacitly acquiesced in the creation of a separate security force for the county judicial system.

This dissenting opinion has been divided into two parts. Part I of my dissent discusses what I consider to be the constitutional and statutory flaws in the majority's opinion. Part II of my dissent sets forth the manner by which the police power has historically been established in this State.

## Part I

### THE MAJORITY DECISION IS NOT SUPPORTED BY THE LAW

The Tenth Amendment of the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." One such power is the power of "states" to provide for the enforcement of laws and ordinances enacted by the states and their political subdivisions. This power is the police power which is manifested in law enforcement agencies.

In 1863, the Constitution of West Virginia did not succinctly articulate the police power afforded to states by the Tenth Amendment. However, in 1872, several amendments were adopted to the state's constitution. Among those amendments was Article I, Section 2, which reads:

> The government of the United States is a government of enumerated powers, and all powers not delegated to it, nor inhibited to the states, are reserved to the states or to the people thereof. *Among the powers so reserved to the states is the exclusive regulation of their own internal government and police;* and it is the high and solemn duty of the several departments of government, created by this constitution, to guard and protect the people of this State, from all encroachments upon the rights so reserved. (Emphasis added.)

Article I, Section 2 of our state's constitution grants the state the authority to police itself. Therefore, "[a]bsent state constitutional or statutory authorization, [political subdivisions of the state] do not have the power to create . . . police."[1]

If one carefully reviews the majority opinion, one will find no constitutional or statutory authority granting a county commission and circuit court, acting jointly or singularly, the power to create a police force distinct from the county sheriffs' law enforcement agency. The majority opinion has relied upon nonpersuasive "layman" type reasoning in order to patch together an unlawful interpretation of statutes and constitutional provisions which purport to show that a county commission and circuit court can jointly distribute police powers in this state. A careful review of the constitution and state statutes illustrates the erroneous reasoning in the majority opinion.

#### 1. The Majority Opinion Violates the Constitutional Separation of Powers Doctrine

My research has revealed no other court which has held that a judicial branch of government could, alone, or in concert with another arm of government, create a police force. The absence of such authority, other than the majority opinion in this case, is due to the respect other courts have given to the "separation of powers doctrine." "As part of our constitutional democracy on both the national and state level, we ascribe to the principle that there shall be three equal branches of government—legislative, executive, and judicial." *State ex rel. Lambert v. Stephens,* 200 W.Va. 802, 809, 490 S.E.2d 891, 898 (1997). The separation of powers doctrine is etched in Article V, Section 1 of the state constitution and provides in part that, "[t]he legislative, executive and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others[.]" The Court explained in *State ex rel. Brotherton v. Blankenship,* 158 W.Va. 390, 402, 214 S.E.2d 467, 477 (1975) that "[t]he system of 'checks and balances' provided for in American state and federal constitutions and secured to each branch of government by 'Separation of Powers' clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government

---

1. Cleckley and Palmer, *Introduction to the West Virginia Criminal Justice System and Its Laws* 31, (Kendall/Hunt 1994)

which impair the constitutional responsibilities and functions of a coequal branch."

The majority opinion cites the case of *Board of County Comm'rs v. Nineteenth Judicial Dist.*, 895 P.2d 545 (Colo.1995) for the proposition that courts can create police forces. That case holds only that a court has inherent powers to order "existing" law enforcement agencies to provide adequate security for the court. The Colorado Supreme Court held that the courts of that state could order the sheriff's department to provide adequate security for courthouses. The opinion was clear in noting that the separation of powers doctrine limited the authority of courts. The opinion also made clear that courts could not infringe upon the powers granted to the executive and legislative branches of government.

The majority opinion in the instant case has carved out an exception to the separation of powers doctrine. The exception allows the county commissions and the judiciary of this state to be co-equal with the state Legislative branch of government in distributing state police powers. Such a decision erodes the essence of our tripartite form of government and, in effect, creates a fourth branch of state government composed of circuit courts and county commissions.

## 2. The Majority Opinion has Nullified Legislative Statutes Designed to Provide Greater Security to Courtrooms

The majority opinion has refused to acknowledge that the legislature is fully aware of national courtroom security problems and has responded affirmatively to add greater protection to the courtrooms of this state. In 1996, the legislature responded to the need to assure security in our courtrooms by enacting a series of statutes designed to address the issue. Under W.Va.Code § 51–3–14 (Supp.1998) a "court security fund" was established specifically for helping to defray the costs of approved enhanced courtroom security.[2] West Virginia Code § 51–3–15 (Supp.1998) created a "court security board" for the purpose of coordinating and approving enhanced courtroom security measures.[3]

2. W.Va.Code § 51–3–14 provides in full:

The offices and the clerks of the magistrate courts and the circuit courts shall, on or before the tenth day of each month, transmit all fees and costs received for the court security fund in accordance with the provisions of sections one and two, article three, chapter fifty of this code and section eleven, article one, chapter fifty-nine of this code for deposit in the state treasury to the credit of a special revenue fund to be known as the "court security fund", which is hereby created under the department of military affairs and public safety. The court security fund may receive any gifts, grants, contributions or other money from any source which is specifically designated for deposit in the fund. All moneys collected and received and paid into the state treasury and credited to the court security fund shall be expended by the board exclusively to implement the improvement measures agreed upon in accordance with the security plans submitted pursuant to section sixteen of this article and in accordance with an appropriation by the Legislature: Provided, That for the fiscal year ending the thirtieth day of June, one thousand nine hundred ninety-seven, expenditures are authorized from collections rather than pursuant to an appropriation by the Legislature. Amounts collected which are found from time to time to exceed the funds needed for the purposes set forth in this article may be transferred to other accounts or funds and redesignated for other purposes upon appropriation by the Legislature.

3. W.Va.Code § 51–3–15 states in full:

(a) There is hereby created a court security board who shall make decisions on how the money in the court security fund is to be spent to enhance the security of courts. The board shall consist of seven members and the administrative director of the supreme court of appeals who shall serve ex officio and be the chair. The board shall be appointed as follows: One circuit court judge appointed by the judicial association; one magistrate appointed by the magistrate's association; one family law master appointed by the family law master's association; one member of the bar appointed by the president of the West Virginia state bar; one representative of counties appointed by the West Virginia association of counties; one representative of sheriffs appointed by the West Virginia sheriffs association; and one representative of the state police appointed by the secretary of the department of public safety.

(b) The members of the board shall each serve terms that commence on the first day of July, one thousand nine hundred ninety-six. Of the initial appointments to the board, two shall serve for two-year terms, two shall serve for three-year terms and two shall serve for four-year terms. Thereafter, each appointment shall be for a four-year term commencing upon the expiration of his or her previous term or of his or her predecessor's term. No member may be appointed for more than three consecutive terms. Vacancies shall be appointed in a like manner for the balance of an unexpired term.

(c) The board shall compile and keep a list of able and available law-enforcement officers who

In fact, W.Va.Code § 51–3–15(c) specifically provides for greater law enforcement personnel in courtrooms. The provision states:

The board shall compile and keep a list of able and available law-enforcement officers who have obtained certification in compliance with the provisions of section five, article twenty-nine, chapter thirty of this code and who have maintained all necessary qualifications and firearms certifications to enable them to serve as bailiffs in court facilities. The board shall make the list available to all county sheriffs for their use in recruiting and hiring temporary, part-time or occasional bailiffs to exercise all the powers and duties of bailiffs in the court facilities in their counties.

Finally, W.Va.Code § 51–3–16 (Supp.1998) sets out the procedure to be followed in creating and implementing enhanced courtroom security plans.[4] A careful reading of the majority opinion will reveal absolutely no discussion of these statutes. Yet, the statutes unequivocally provide the manner and method of providing for enhanced courtroom security throughout the state.[5]

have obtained certification in compliance with the provisions of section five, article twenty-nine, chapter thirty of this code and who have maintained all necessary qualifications and firearms certifications to enable them to serve as bailiffs in court facilities. The board shall make the list available to all county sheriffs for their use in recruiting and hiring temporary, part-time or occasional bailiffs to exercise all the powers and duties of bailiffs in the court facilities in their counties.

4. W.Va.Code § 51–3–16 states in full:

(a) The sheriff of each county in conjunction with the circuit judges, magistrates and family law master may develop a security plan to enhance the security of all the court facilities in use in the county and submit said plan to the court security board.

(b) Each security plan shall include, but not be limited to:

(1) An assessment of the existing security measures in place and any problems or shortcomings with the existing procedures;

(2) A description of how the county responds to court security emergencies and whether the response is adequate;

(3) A prioritized listing of equipment or personnel, or both, needed to improve the security of the court facilities in the county, including cost estimates for such equipment and personnel;

(4) A description of the physical locations of court facilities around the county and a discussion of whether changes or consolidation of space could improve court security in the county; and

(5) An assessment of the training needs for bailiffs currently employed in the county or for additional bailiffs and the options for securing the necessary training.

(c) Each plan prepared under this section is subject to approval by the court security board. Any plan rejected by the court security board shall be returned to the county with a statement of the insufficiencies in such plan. The county shall revise the plan to eliminate the insufficiencies and resubmit it to the court security board.

(d) Upon receipt of the plans the court security board shall meet at least twice a year to review the plans and to award money from the court security fund to the circuit clerk, county commission or county sheriff to be used solely and exclusively to purchase equipment, hire personnel or make other identified expenditures in accordance with the plan. The board shall develop an application form and establish criteria to assist them in making the decisions on which applications will receive money and how much money will be awarded. Once an award has been made, the recipient will have a fixed amount of time in which to execute the expenditures described in their plan. The board will set forth in writing the amount of the award, the time frame for accomplishing the plan objectives and the requirement that any unexpended money be returned to the board for deposit in the court security fund. The award or decision not to award these funds shall not relieve any person or office of their duty or obligation to provide security services to courts in this state.

(e) The board is authorized to award money from the court security fund to be used by the counties for costs and expenses of training for bailiffs. The board may establish minimum standards for training and it may designate specific agencies or institutions approved for administering such training.

5. It seems quite clear to me why the legislature decided to set up a system for providing additional courtroom security. Many counties do not have budgets that would permit sheriffs to hire additional deputies specifically for courtroom security. For example, the following is the breakdown of the approximate number of deputies in each county:

| | | | |
|---|---|---|---|
| Barbour | 5 | Hardy | 4 |
| Berkeley | 29 | Harrison | 31 |
| Boone | 19 | Jackson | 13 |
| Braxton | 5 | Jefferson | 11 |
| Brooke | 16 | Kanawha | 70 |
| Cabell | 32 | Lewis | 8 |
| Calhoun | 2 | Lincoln | 8 |
| Monongalia | 20 | Taylor | 4 |
| Monroe | 4 | Tucker | 3 |
| Morgan | 6 | Tyler | 4 |
| Nicholas | 15 | Upshur | 7 |
| Ohio | 23 | Wayne | 12 |
| Pendleton | 1 | Webster | 3 |
| Pleasants | 6 | Wetzel | 5 |

It is clear from the new statutes regarding courtroom security that the legislature was ever so mindful of the county sheriff's constitutional charge to provide law enforcement for his/her county. In fact, a plain reading of W.Va.Code § 51–3–15(c) establishes that it is the responsibility of county sheriffs to recruit and hire bailiffs in the court facilities throughout the State of West Virginia. By crafting this new legislation, the legislature was very aware of the constitutional duties of the sheriff, the civil service rules and regulations for the county law enforcement officers and the enhanced need for greater security in courtrooms. Thus, a fair and reasonable interpretation of the court security statutes establishes that the recruiting and hiring of temporary, part-time or occasional bailiffs is the sole and exclusive responsibility of the county sheriff. In fact, W.Va.Code § 51–3–16(d) explicitly states that the award or decision not to award these funds shall not relieve any person or office of their duty or obligation to provide security services to courts in this State.

The majority opinion could not legally circumvent the legislature's express statutes on the very issue presented to the Court. So, the opinion fails to even mention the court security statutes. The net effect of the majority's silence is chilling. Under the decision rendered by the majority, the legislative initiative to control the hiring of additional courtroom bailiffs by means which follow the constitution and abide by the state civil service statutes has been discarded. This situation could have been easily avoided, had the Putnam County Commission simply invoked the statutes and worked with the court security board and the sheriff's department in developing a lawful plan to institute greater security for the courthouse. This is not to say that the only option for the county commission was that of invoking the court security statutes. Alternatively, the county commission could simply have increased the budget of the sheriff so that the sheriff could hire additional qualified deputy sheriffs, as well as purchase the new security equipment.

### 3. The Constitution Grants the Sheriff Authority to Enforce Laws on Behalf of the County

County law enforcement is complex in its creation and supervision. To begin, the Tenth Amendment to the federal constitution reserved nondelegated and nonprohibited powers to the states and to the people. "It was the 'people' of our state, and not the state, who decided to create an internal law enforcement agency in each of our fifty-five counties. The exercise of 'people' power was manifested in Article 9, Section 1 of the state constitution. It is there that the voters of each county were given the authority to elect a sheriff of their respective county[.]"[6] The office of county sheriff is a constitutionally created office.[7] However, county sheriffs are

| | | | |
|---|---|---|---|
| Clay 5 | Logan 18 | Pocahontas 4 | Wirt 1 |
| Doddridge 1 | Marion 25 | Preston 11 | Wood 30 |
| Fayette 26 | Marshall 23 | Putnam 24 | Wyoming 15 |
| Gilmer 3 | Mason 12 | Raleigh 42 | |
| Grant 5 | McDowell 10 | Randolph 6 | |
| Greenbrier 17 | Mercer 21 | Ritchie 3 | |
| Hampshire 7 | Mineral 6 | Roane 6 | |
| Hancock 23 | Mingo 15 | Summers 1 | |

The numbers clearly indicate that there are differences in the budgets of county sheriffs. To help with the costs in this area, the legislature established the court security fund. Therefore, no reasonable argument can be made that in order for sheriffs to adequately provide security for courtrooms they would have to remove existing deputies from their other duties. The court security fund was implemented to assist with the costs of hiring additional deputies. Of course, it may be that the court security fund is not sufficiently solvent at this time to defray the costs of the number of people the Putnam County Commission sought to hire. Even so, that is not an excuse for going outside the constitution and law to address the matter. As I have pointed out in the main text, the county commission could simply have lawfully increased the budget of the sheriff, so that the sheriff could hire additional deputies. This option would not have been in violation of the constitution or any law.

6. Cleckley and Palmer, *Criminal Justice, supra,* note 1 at 18.

7. In addition to their law enforcement duties, W.Va.Code § 7–5–1 (1993) obligates county sheriffs to act as county treasurers. W.Va.Code § 7–

not autonomous. Article 9, Section 11 of the state constitution grants authority to county commissions to superintend and administer the internal police of their counties. Further, as previously stated, Article 1, Section 2 of the state constitution grants authority to the state to regulate the internal police of the state. Thus, both the state and the county commissions have a limited role in the police power of the sheriff. In syllabus point 2 of *Amoroso v. Marion County Com'n,* 172 W.Va. 342, 305 S.E.2d 299 (1983) this Court stated that "[c]ounty commissions and sheriffs are joint employers of deputy sheriffs." [8] In Article 9, Section 6 of the constitution, the state has authority, through enactment of general laws, to provide for the compensation, duties, and responsibilities of county sheriff departments, as well as regulating the appointment of deputy sheriffs. "In a manner of speaking, county sheriff's departments are subject to two masters: the state and their respective county commissions." [9]

The primary responsibility of county sheriffs is fighting crime. West Virginia Code § 62–10–9 (1997) grants county sheriff departments the authority to enforce federal and state law, within the geographical/political boundaries of each respective county. More importantly, based upon W.Va.Code § 51–3–5 (1994) it is the sheriff (acting through deputies) who is required to provide courtroom security with full arrest powers and the authority to use deadly force and carry firearms. While the county commission may, indeed, have authority to unilaterally provide "security guards" for county courthouses, those security guards, without proper statutory authorization by the Legislature of the State of West Virginia, cannot be clothed with arrest powers, authority to

use deadly force and carry firearms. This conclusion is supported by both the Colorado Supreme Court decision in *Board of County Comm'rs v. Nineteenth Judicial Dist.,* supra, which clearly illustrates that a court has power to order "existing" law enforcement agencies to provide adequate security for the court, as well as this Court's opinion in *Frazier v. Meadows,* 193 W.Va. 20, 454 S.E.2d 65 (1994). In *Frazier* this Court held that only when a circuit court and sheriff disagree does the circuit court judge have the authority to enter an order designating which deputy sheriff, under the direction and control of the county sheriff, will be the bailiff in his or her courtroom.

### 4. The Majority Decision Undermines Civil Service Statutes for County Law Enforcement

West Virginia Code § 7–14–3 (1993) created county civil service commissions to regulate the appointment, promotion and other personnel matters involving deputy sheriffs. County civil service commissions must promulgate rules and regulations that provide for the training of appointees, as well as in-service training for deputies throughout their law enforcement careers. West Virginia Code §§ 7–14–9 through 7–14–14 set out very stringent and extremely competitive requirements for the hiring of deputy sheriffs. Deputy sheriff candidates must pass a written examination and must pass a medical examination. Upon satisfying these requirements, pursuant to W.Va.Code § 7–14–10, the deputy sheriff candidate must meet eight (8) additional preliminary requirements before being certified as having fulfilled the minimum requirements to hold the position of a county deputy sheriff.[10] Only after these statutory requirements are met, does

8–2 (1993) mandates every county sheriff act as keeper of county jails. W.Va.Code § 51–3–5 (1994) requires that county sheriffs provide deputies in every circuit courtroom. W.Va.Code § 50–1–14 (1994) states that if a magistrate requests a county sheriff department provide an officer to it, then an officer may be provided. W.Va.Code § 7–10–1 (1993) requires county sheriffs fulfill the duties of humane officer for their counties, if county commissions and county sheriff cannot agree to allow county dog wardens to carry out the duties of humane officer. W.Va. Code § 47–1–14 (1996) provides that if county commissions do not appoint sealers of weights

and measures, the county sheriff is mandated to be the ex officio county sealer of weights and measures.

**8.** *See also* W.Va.Code § 6–3–1(a)(2) (1993) (requiring the sheriff of each county seek the consent of their respective county commissioners in appointing deputy sheriffs).

**9.** Cleckley and Palmer, *Criminal Justice, supra,* note 1 at 19.

**10.** W.Va.Code § 7–10–14 states in relevant part:

the sheriff notify the civil service commission of a vacancy. The commission then provides the sheriff with the list of eligibles which contains the names of three (3) persons who received the highest averages at preceding competitive examinations. It is from the eligibility list that the deputy sheriff position is filled. Therefore, based upon the civil service statutes, the citizens of each county are assured that they are being protected by the most highly trained and highly competent law enforcement personnel.[11]

The decision rendered by the majority opinion undermines all of the legislative efforts to bring about fairness in the hiring of county law enforcement deputies. Under the ad hoc procedure approved by the majority opinion, county commissions and circuit courts can circumvent the civil service statutes. In essence, the majority opinion emasculates the civil service statute for deputy sheriffs and provides, once again, the opportunity for political mischief, which all law enforcement personnel have fought so hard to prevent and to defeat.

In the final analysis, the Putnam County Commission had a duty and responsibility to provide more funding to the sheriff's department and/or follow the court security statutes for the express purpose of hiring additional deputy sheriffs to provide courtroom and courthouse security. The unlawful course chosen by the county commission has assaulted the integrity of our civil service laws.

### 5. The Circuit Court Lacked Authority to Issue An Order Allowing Concealed Weapons to be Carried

The majority opinion notes that the circuit court empowered its police force with the authority to carry concealed weapons. Neither the majority opinion nor the record in this case indicates that proper procedures were followed for the circuit court to consider the issue of concealed weapons. Through an amendment to W.Va.Code § 61–7–4 (1997), the legislature removed initial consideration of licensure for carrying a deadly weapon from the jurisdiction of courts. West Virginia Code § 61–7–4(a) (1997) unequivocally provides that "any person desiring to obtain a state license to carry a concealed weapon shall apply to the sheriff of his or her county for such license[.]" W.Va.Code § 61–7–4(f) (1997) states that "[i]f the information in the application [for carrying a concealed weapon] is found to be true and correct, the sheriff shall issue a license." West Virginia Code § 61–7–4(k) (1997) states that "[a]ny person denied a license may file, in the circuit court of the county in which the application was made, a petition seeking review of the denial [of a license]." The record in this case does not demonstrate that the circuit court issued its order permitting concealed weapons to be carried by members of its police force. Without a denial of a license to carry a concealed weapon by a sheriff, no circuit court has authority in this state to issue an order authorizing anyone to carry a concealed weapon. By its decision in this case, the majority opinion has totally disregarded W.Va.Code § 61–7–4.

### Part II

### REVIEW OF THE ESTABLISHMENT OF POLICE POWER IN THE STATE OF WEST VIRGINIA

I provide Part II of my dissent because I believe it supports my contention that the

---

The commission may refuse to examine an applicant, or after examination to certify as eligible one, who is found to lack any of the established preliminary requirements for the examination or position of deputy sheriff for which he applies; or who is physically so disabled as to be rendered unfit for the performance of the duties of the position of deputy sheriff desired; or who is addicted to the habitual use of intoxicating liquors or drugs; or who has been convicted of a felony; or who has been guilty of infamous or notoriously disgraceful conduct; or who has been dismissed from public service for delinquency or misconduct; or who has made a false statement of any material fact, or practiced or attempted to practice any deception or fraud in

his application, in any such examination, or in securing his eligibility; or who refuses to comply with the rules and regulations of the commission.

**11.** This opinion is not suggesting that the court security personnel at the Putnam County courthouse are unskilled or untrained. To the contrary, Mr. Doug Ratliff, who is a former state police officer, is a highly skilled and a highly trained law enforcement officer. However, as the majority opinion is written, there is nothing to assure that the same type of highly trained and skilled courtroom security personnel is or will be hired in the other 54 counties.

majority opinion is absolutely wrong. The majority opinion tries to support its decision by indicating that implicit authority gives county commissions and circuit courts the power to create police forces. I believe the legislature has been most clear in its statutory distribution of the police power of the state. As the following review demonstrates, absent express language, no statute can be said to implicitly grant police powers.[12]

### 1. Municipal Police

Municipalities[13] do not have inherent authority to create municipal police departments[14]. The inherent power of municipalities is limited to those areas not addressed by the state constitution or state legislation. One of the areas addressed by state legislation is municipal police. The relevant part of W.Va.Code § 8–14–1 (1998) provides that "every municipality shall have plenary power and authority to protect persons and property within the municipality and preserve law and order therein, and, for this purpose, to provide for, establish, equip and maintain a police force or department." This code section does not itself create municipal police, it empowers municipalities with the authority to create municipal police. Absent such explicit statutory authorization, municipalities cannot create police agencies.

West Virginia Code § 8–14–3 (1998) outlines in relatively broad terms the authority municipal police have in protecting life and property, and preserving law and order. The statute vests two types of enforcement powers in municipal police, i.e., the power to enforce municipal ordinances and the power to enforce state criminal laws. Moreover, W.Va.Code § 8–14–7 (1998) makes it mandatory that every qualified municipality establish a "Policemen's Civil Service Commission."[15] Finally, in order for an individual to become a municipal police officer, W.Va.Code § 30–29–5 (1993) requires that he or she be certified "by the governor's committee as having met the minimum entry level law-enforcement qualification and training program requirements[.]" Training requirements for municipal police do not end with entry level requirements. West Virginia Code § 30–29–6 (1993) mandates annual in-service training for municipal police officers and biennial in-service training for municipal police supervisors.

### 2. State Police

Chapter 12 of the Acts of West Virginia, Extraordinary Session of 1919, reads in part: "AN ACT creating a department of public safety, to provide protection for the lives and property of the inhabitants of the state of West Virginia[.]" By those words, the West

---

**12.** I have previously provided some discussion on county law enforcement. Therefore, I will not repeat that discussion in this section of my dissent. *See* Part I, § 3, *supra*.

**13.** Unless otherwise indicated, municipalities refers to incorporated cities, towns and villages without regard to population size.

**14.** In stating that municipalities do not have inherent authority to create police departments, I am not unmindful of Article 6, Section 39(a) of the state constitution. "This constitutional provision is an amendment to the state's constitution that was ratified in 1936. It provides for 'home rule' by municipalities. The home rule provision of the state's constitution provides in broad ... language for municipalities to have a role in their internal affairs. The home rule provision does not in fact give to municipalities the type of power and control the term "home rule" would reasonably suggest. While there are many reasons which prompted the insertion of the home rule provision in the state's constitution, its primary purpose was to place limitations on the state's power and not to grant additional consti-

tutional powers to municipalities. To be specific, the drafters were concerned with preventing the state from passing 'special laws'. That is, laws directed at a specific municipality or group of municipalities." Cleckley and Palmer, *Criminal Justice*, supra, note 1 at 5.

**15.** Qualified municipality refers to the limitations imposed by the municipal police civil service commission statutes. Under the statutes, municipalities with populations that are less than ten thousand are not required to have civil service commissions, nor are the civil service provisions of the statutes applicable to such municipalities generally. Municipalities with populations that are less than ten thousand have the option of being covered by the civil service provisions, if the issue is put before the residents at an election and the majority of the voters approve of having the civil service provisions made applicable to their municipal police force. Additionally, in order for any municipal police force to come under the statute's civil service provisions, the municipal police agency must be maintained and paid with public funds, and its employees must be paid on a full-time basis out of public funds.

Virginia state police force was created on March 31, 1919. The governor, as provided in Article 7, Section 5 of the state constitution, is the chief executive of the state police. The purpose behind the creation of the state police force is succinctly set forth in W.Va. Code § 15–2–12(a) (Supp.1997), which provides that the state police "shall have the mission of statewide enforcement of criminal and traffic laws with emphasis on providing basic enforcement and citizen protection from criminal depredation throughout the state and maintaining the safety of the state's public streets, roads and highways." It is further provided in W.Va.Code § 15–2–12(b)(3) (Supp.1997) that the state police "cooperate with local authorities in detecting crime and in apprehending any person or persons engaged in or suspected of the commission of any crime, misdemeanor or offense against the law of this state, or of the United States, or of any ordinance of any municipality in this state[.]" "This sweeping language aims at enforcement of all laws in the state. Implicit in this fact is the idea that law enforcement will be uniform and void of local selective enforcement of criminal laws." [16] Finally, W.Va.Code § 15–2–12(e) (Supp.1997) states that if a county sheriff requests the assistance of the state police or if the governor so directs by proclamation, the state police "shall have full power and authority ... to direct and command absolutely the assistance of any sheriff, deputy sheriff, chief of police, policeman, game or fish warden, and peace officer of the state, or of any county or municipality therein, or of any able-bodied citizen of the United States, to assist and aid in accomplishing the purposes expressed in this article." Commentators have observed that "[s]ection 15–2–12(e) empowers the state police to 'deputize' any citizen as a state police officer under specified conditions. The inference to be drawn from this provision is that the power to 'deputize' cannot be lightly exercised. The legislature, no doubt, had in mind dramatic events precipitating the exercise of this power, e.g., a natural disaster threatening lives or property, or a riot." [17]

### 3. Municipal Park Police

West Virginia Code § 8–21–1 (1998) empowers every city "to provide for by charter provision, or to create by ordinance, a board of park and recreation commissioners, for the purpose of establishing, constructing, improving, extending, developing, maintaining and operating a city park and recreation system." The boards of municipal park and recreation are empowered to promulgate rules and regulations, which may carry penalties when adopted in ordinances by municipal governing bodies. *See* generally, *Rogers v. City of South Charleston*, 163 W.Va. 285, 256 S.E.2d 557 (1979) (discussing powers of boards). A provision in W.Va.Code § 8–21–10 (1998) provides that municipal boards of park and recreation may "employ such police officers as [they] shall deem proper and necessary." In a 1954 opinion by the state's attorney general it was opined that park police officers must have a license to carry a gun, but that such police officers could not make lawful arrests outside property under the jurisdiction of municipal park and recreation boards. 45 Op. Att'y Gen. 699 (1954).

### 4. County Park Police

Each county commission is authorized, by W.Va.Code § 7–11–1 (1993), "to create a county parks and recreation commission for the purpose of establishing, improving, developing, administering, operating and maintaining a county public parks and recreation system or public recreational facilities." The commission for county parks and recreation is authorized to promulgate rules and regulations for the management and control of county parks and recreation facilities. Rules and regulations promulgated by county parks and recreation commissions may be adopted by respective county commissions. West Virginia Code § 7–11–5 (1993) provides that:

> The violation of any such rule and regulation so adopted by the county commission shall constitute a misdemeanor, and any person convicted of any such violation shall be punished by a fine of not less than five dollars nor more than one hundred dollars, or by imprisonment in jail for a period not

**16.** Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 40.

**17.** Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 42.

exceeding thirty days, or by both such fine and imprisonment.... The violation of any such rule and regulation which also constitutes the violation of any state law or municipal ordinance may be prosecuted and punished as a violation of such state law or municipal ordinance rather than under the provisions of this section.

West Virginia Code § 7–11–5 contains a provision which authorizes county parks and recreation commissions to employ police officers. This code section also provides, unlike statutory provisions for municipal parks and recreation, that:

In any area under the jurisdiction and control of the [county parks and recreation] commission, or in connection with any properties or facilities under the jurisdiction and control of the [county parks and recreation] commission, or in pursuit of one or more individuals therefrom, any park police officer so appointed shall have all the power and authority which a regularly appointed deputy sheriff of such county has in enforcing the criminal laws of the state. Notwithstanding any provisions of this code to the contrary, park police officers appointed as aforesaid shall not be required to obtain a state license to carry a weapon....

### 5. State Conservation Officer

Pursuant to W.Va.Code § 20–1–13 (1996) the director of the division of natural resources is authorized to select a chief conservation officer to head the law enforcement unit of the division of natural resources. West Virginia Code § 20–7–1C (1996) establishes "the ranks within the law-enforcement section of the division of natural resources [as] colonel, lieutenant colonel, major, captain, lieutenant, sergeant, conservation officer and conservation officer-in-training." [18]

---

18. The powers and duties of conservation officers are set out in W.Va.Code § 20–7–4 (1996). This statute provides in pertinent part:

The authority, powers and duties of the conservation officers shall be statewide and they shall have authority to:

(1) Arrest on sight, without warrant or other court process, any person or persons committing a criminal offense in violation of any of the laws of this state, in the presence of such officer ...'

(2) Carry such arms and weapons as may be prescribed by the director ... but no license or other authorization shall be required of such officers for this privilege;

(3) Search and examine, in the manner provided by law, any boat, vehicle, automobile, conveyance, express or railroad car, fish box, fish bucket or creel, game bag or game coat, or any other place in which hunting and fishing paraphernalia, wild animals, wild birds, fish, amphibians or other forms of aquatic life could be concealed, packed or conveyed whenever they have reason to believe that they would thereby secure or discover evidence of the violation of any [natural resource statute];

(4) Execute and serve any search warrant, notice or any process of law issued under the authority of [the natural resource statutes] or any law relating to wildlife, forests, and all other natural resources, by a magistrate or any court having jurisdiction thereof, or copies of orders made and entered by the chief of the division of water resources, or, without fee, any subpoena or subpoena duces tecum ... in the same manner, with the same authority, and with the same legal effect, as any [deputy sheriff] or sheriff can serve or execute such warrant, notice or process;

(5) Require the operator of any motor vehicle or other conveyance on or about the public highways or roadways, or in or near the fields and streams of this state, to stop for the purpose of allowing such officers to conduct game-kill surveys;

(6) Summon aid in making arrests or seizures or in executing any warrants, notices or processes, and they shall have the same rights and powers as sheriffs have in their respective counties in so doing;

(7) Enter private lands or waters within the state while engaged in the performance of their official duties hereunder ...;

(8) Arrest on sight, without warrant or other court process ... any person or persons committing a criminal offense in violation of any law of this state in the presence of any such officer on any state-owned lands and waters and lands and waters under lease by the division of natural resources and all national forest lands, waters and parks, and U.S. Corps of Army Engineers' properties within the boundaries of the State of West Virginia, and, in addition ... execute all warrants of arrest on such state and national lands, waters and parks, and U.S. Corps of Army Engineers' properties....

Finally, tucked away in W.Va.Code § 20–1–13 (1996) is the following authority granted to conservation officers:

... conservation officers are hereby authorized to enter into and upon private lands and waters to investigate complaints and reports of conditions, conduct, practices and activities considered to be adverse to and violative of the [natural resource statutes] and to execute writs and warrants and make arrests thereupon.

In addition to having a regular full-time staff of conservation officers, the chief conservation officer is permitted, by W.Va.Code § 20–7–1 (Supp.1997), to select and appoint "special" and "emergency" conservation officers. "Emergency" conservation officers have all the powers and duties of regular full-time conservation officers. However, "special" conservation officers are limited in the scope of their powers and duties. Further, W.Va. Code § 20–7–1b (1996) authorizes the director of the division of natural resources to "enter into a written agreement with a federal agency providing for the appointment of employees of the federal agency as special conservation officers and setting forth the terms and conditions within which such federal employees may exercise the powers and duties of special conservation officers." West Virginia Code § 20–7–3 (1996) rounds out the additional law enforcement help available to the division of natural resources, by providing that:

> The sheriffs and [deputy sheriffs] of the several counties of the State, police officers of any city and members of the department of public safety shall be vested, within their respective jurisdictions, with all the powers and authority of conservation officers without requirement of any additional oath or bond. Immediately upon making any arrest or executing any process under provisions of [the natural resources statutes], each such officer shall report thereon to the director [of the division of natural resources].

See *State v. Boggess*, 172 W.Va. 619, 309 S.E.2d 118 (1983) (discussing arrest powers of conservation officers).

### 6. School Zone Police

West Virginia Code § 8–14–5 (1998) provides, in relevant part, that "[e]very municipality shall have plenary power and authority to provide by ordinance for the appointment of special school zone police officers, who shall have the duty of controlling and directing traffic upon designated parts of the streets, avenues, roads, alleys or ways at or near schools[.]" The statute states that school zone police "shall be vested with all the powers of local police officers ... [but] shall not come within the civil service ... or the policemen's pension and relief fund provisions[.]" In other words, "[t]he Code grants school zone police all the powers given to municipal police, which include arrest powers." [19]

### 7. Parking Lot Police

West Virginia Code § 8–14–5a (1998) states, in relevant part, that "[e]very municipality shall have plenary power and authority to provide by ordinance for the appointment of special parking lot or parking building police officers, whose sole duties shall be to patrol, and to enforce municipal ordinances upon or within, designated parking lots and parking buildings either owned by, or leased to, or under the control of, and operated by, the municipality or any board, commission or authority created by the municipality[.]" The statute goes further and provides that "such special parking lot or parking building police officers shall be vested with the power to make arrests, issue summonses, sign complaints and request the issuance of capiases ... [but] shall not come within the civil service ... or the policemen's pension and relief fund provisions[.]"

### 8. Special Fair Police

Under W.Va.Code § 62–10–8 (1997), a magistrate, on the application of any of the officers of any state, county, or independent agricultural and mechanical association, agricultural society or industrial association of this state, may "appoint, a suitable number of discreet persons to assist in keeping the peace during the time when any such society shall be holding its annual or other fairs[.]" The statute provides further that all fair police appointed by magistrates "shall have full power, and it shall be their duty, to suppress all riots, disturbances and breaches of the peace that may occur on such fair grounds, or within one mile thereof, during the time such fairs are being held, and may, upon view, arrest any person who may, at such time and place be guilty of violating any law of this State, and may pursue and arrest any such person anywhere in this State[.]"

19. Cleckley and Palmer, *Criminal Justice*, supra, note 1 at 73.

## 9. Special Weights And Measures Police

It is provided in W.Va.Code § 47–1–1(d) (1996) that the words weights or measures "means all weights and measures of every kind, instruments and devices for weighing and measuring and any appliance and accessories associated with any or all such instruments and devices." Under W.Va.Code § 47–1–3(q)(5) (1996), the state commissioner of labor and his/her deputies and inspectors are "vested with special police powers, and [are] authorized to arrest, without formal warrant, any violator of [weights and measures laws]."

## 10. Railroad Police

West Virginia Code § 61–3–41 (1997) provides that, "the conductor of every passenger car and flagmen and brakemen employed on such car ... shall have all the powers of a conservator of the peace while in charge of such car[.]" The statute further provides that "the conductor of every train of railroad or traction cars, shall have all the powers of a conservator of the peace while in charge of such car or train." In the case of *Marcuchi v. Norfolk & W.Ry.*, 81 W.Va. 548, 94 S.E. 979 (1918), the Court indicated that a conservator of the peace has the authority and duty to prevent breaches of the peace, and to arrest persons breaching the peace in his or her presence. Moreover, *Marcuchi* held that the authority granted to railroad company personnel by code § 61–3–41 included the power to arrest, without a warrant, for breaches of the peace in their presence, and under some circumstances the power to arrest for a felony not committed in his or her presence. In the case of *Layne v. C & O Ry.*, 66 W.Va. 607, 67 S.E. 1103 (1909), it was pointed out that the police powers of conductors, flagmen and brakemen can be lawfully exercised only while they are in charge of their trains.

West Virginia Code § 61–3–41 does not stop with merely empowering certain employees of railroad companies with police powers. This statute provides in relevant part:

Any railroad company ... using any railroad ... system lying wholly or partially within this State ... may apply to the governor to appoint such citizen or citizens of this State as such railroad company may designate, to act as special police officers for such railroad ... company ... and the governor may ... appoint and commission such person or persons ... as such special police officers ... every police officer appointed ... shall be a conservator of the peace within each county in which any part of such railroad may be situated, and ... he shall possess and may exercise all the powers and authority ... as are now or hereafter may be vested in or conferred upon a deputy sheriff of such county ... and such railroad company shall pay them for all services rendered by them pursuant to such appointment.

"If one understands that many railway tracks traverse sparsely populated areas for miles upon miles, it should be readily apparent as to why the state would authorize police powers to railroad companies." [20]

## 11. Local Conservator of the Peace

Many of the rural and isolated communities in our state are unincorporated. That is, communities which have not qualified under the code to hold a legal existence as a municipality. Unincorporated communities vary in population size, but probably average no more than a few hundred households. Many such unincorporated communities are in remote areas that have infrequent contact with regular law enforcement agencies simply because of the remoteness of their locations. It is primarily for this reason that the legislature has established a method by which unincorporated communities can have access to law enforcement services from within such communities. West Virginia Code § 6–3–1(b)(1) (1993) provides in pertinent part, that "[a]ny resident or group of residents of any unincorporated community ... may petition the sheriff for the appointment of a local conservator of the peace and such sheriff ... may with the assent of said county [commission] and the judge of the circuit court ... appoint any person or persons a local conservator of the peace[.]" This provision gives the sheriff the authority to make the actual

20.  Cleckley and Palmer, *Criminal Justice*, supra,  note 1 at 78.

selection of an individual to serve as local conservator of the peace. In the case of *Hockman v. County Court,* 138 W.Va. 132, 75 S.E.2d 82 (1953), it was held that the latter code provision prohibits a person from taking the position of local conservator of the peace, if such person has not received the consent of, or has been rejected by, the county commission and/or circuit court judge.

The county commission and circuit court judge are guided by the code in the factors they should consider in determining whether or not to consent to the appointment of an individual as local conservator of the peace. West Virginia Code § 6–3–1(b)(2) (1993) provides that the county commission and circuit court judge must be satisfied that such an appointment is needed,

> because of the lack of sufficient funds, geographical location of the unincorporated community for which such conservator is to be appointed, or other good reason, the sheriff and his regular deputies ... are not sufficient to afford proper local policing of such community and that the person or persons moving for the appointment of such local conservator have made satisfactory arrangements to compensate him for his services as such local conservator of the peace.

"Note that the latter Code provision exempts the county or other political entity from bearing the cost of paying a local conservator of the peace. A salary or wages for such an individual has to be arranged by the community, individual or individuals who petitioned for such an appointment." [21] Unincorporated communities are not entitled to have an unlimited number of local conservators of the peace. The statute provides that only two conservators of the peace may be appointed to one unincorporated community. Further, that if an incorporated community does not have a population that exceeds fifteen hundred people, it may only have one local conservator of the peace appointed. The law enforcement powers of a local conservator of the peace are set out in W.Va.Code § 6–3–1(b)(3) (1993), which provides in part:

Such local conservator of the peace shall have all the powers and duties of a regularly appointed deputy sheriff.... He shall act as such local conservator only in the unincorporated community for which he is appointed, and within a distance of one mile from the boundaries thereof as fixed by the county [commission] ... except that in fresh pursuit he may effect arrests anywhere in the county.... Any person arrested by such local conservator shall, with all convenient speed, be turned over to the sheriff, or one of his regular deputies....

### 12. Airport Police

"Law enforcement at airports in our state may be carried out generally in one of three ways: by on-site county or municipal law enforcement agents, privately employed security, or a combination of private security and county or municipal law enforcement agents. [My] interest is solely concerned with the creation of, and powers and duties of private airport security." [22] West Virginia Code § 8–29B–4(a) (1998) provides:

> To enforce any federal or state laws or rules and regulations relating to airports and airport security and any rules and regulations promulgated by the airport operator, to protect air passengers, airport personnel, aircraft and the airport and to preserve law and order in connection therewith, the airport operator shall have plenary power and authority to make arrangements for one or more airport police officers....

In W.Va.Code § 8–29B–4(c) (1998) it states in relevant part that "[a]ny person appointed or designated as an airport police officer ... shall, before entering upon the performance of his duties, qualify in the same manner as is required of a [deputy sheriff] by the taking and filing of an oath of office ... and by the filing of an official bond[.]" Further, W.Va. Code § 8–29B–4(f) (1998) states that "[e]very airport police officer shall be trained in the use of firearms and shall ... carry a firearm at all times while on duty." Under West Virginia Code § 8–29B–6 (1998) "at least one

**21.** Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 79.

**22.** Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 81.

airport police officer must be present prior to, at the point of, and throughout the final passenger screening process prior to the boarding of an aircraft at an airport ... and such police officer shall be present continuously until all doors on such aircraft being boarded are closed and such aircraft has taxied away from the boarding area." The general law enforcement powers of airport police are set out in W.Va.Code § 8–29B–5, which states in part:

> In any area under the jurisdiction and control of the airport operator, or in connection with the airport, or in pursuit of one or more individuals therefrom, any airport police officer shall have (1) all of the power and authority which a regularly appointed deputy sheriff of a county in this State has in enforcing the criminal laws of this State; (2) full power and authority to enforce any and all federal laws and rules and regulations relating to airports, air passengers, baggage inspection, the screening of air passengers and other airport security measures; (3) full power and authority to enforce any and all rules and regulations promulgated by the airport to enforce any and all rules and regulations promulgated by the airport operator; and (4) the power to search persons, packages, containers and baggage and the power to arrest persons. ...

### 13. University and College Police

In authorizing the governing boards of universities and colleges to appoint campus police officers, W.Va.Code § 18B–4–5 (1997) makes clear that the presence of such officers "shall not be deemed to supersede in any way the authority or duty of other peace officers to preserve law and order on such premises." "Thus, regular law enforcement agents have concurrent jurisdiction with campus police on campus premises." [23] West Virginia Code § 18B–4–5 provides further that campus police officers have a duty

> to preserve law and order on any premises under the jurisdiction of the governing

boards and on any other street, road or thoroughfare ... adjacent to· or passing through such premises. ... For this purpose the security officer shall be deemed to be a law-enforcement officer ... as to offenses committed within any area so assigned, have and may exercise all the powers and authority and shall be subject to all the requirements and responsibilities of a law-enforcement officer. ...

The statute adds that campus police are prohibited from carrying firearms, unless they have been issued a state license to carry the same.

### 14. Special Security Officers for State Premises

West Virginia Code § 5A–4–3 authorizes the secretary of the Department of Administration "to appoint bona fide residents of this state to act as security officers upon any premises owned or leased by the state of West Virginia and under the jurisdiction of the secretary[.]" The statute provides further that such security officers "shall as to offenses committed on such premises have and may exercise all the powers and authority and shall be subject to all the responsibilities of a deputy sheriff of the county." The statute notes that the authority of security officers "shall not be deemed to supersede in any way the authority or duty of other peace officers to preserve law and order on such premises." Finally, it is stated under the statute that no security officer "shall have authority to carry a gun or any other dangerous weapon until he shall have obtained a license therefor[.]" [24]

### Part III.

### CONCLUSION

The state constitution and state statutes prohibit the very action upheld by the majority's opinion. Therefore, I respectfully dissent from the majority opinion in this case.

---

23. Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 83.

24. For a discussion of the police powers of the military forces of the state, special police powers

of the governor and police powers of the Office of Emergency Services, see Cleckley and Palmer, *Criminal Justice,* supra, note 1 at 49–65.

STARCHER, Justice, concurring:

(Filed Nov. 9, 1998)

I fully concur with the majority opinion and with Justice Workman's concurrence. I write separately to address several practical matters.

First, under the majority opinion, there is no prohibition against court security personnel being non-deputy sheriff employees of the sheriff's department, instead of being direct county commission employees. This arrangement has worked successfully in a number of counties, including for many years in my home county of Monongalia.

Second, it is up to circuit judges, county commissions, county sheriffs, and the Legislature if necessary, to work together to implement practical and efficient systems to deliver efficient courtroom and courthouse security and bailiff services. If conflicts arise, circuit courts and this Court should not be tolerant of parties who have not shown a willingness to compromise and work cooperatively.

Third, to do our part to facilitate this cooperation, I think this Court needs to consider modifying or eliminating *Trial Court Rule* V's requirement that "deputies" be present while court is in session. This frequently works a hardship on already overworked sheriffs' offices—particularly in light of the need for "road deputies." Modification or elimination of Rule V would allow increased flexibility for appropriate services to be provided by both deputy and non-deputy personnel, whether employees of the sheriff or the county commission.

Fourth, I note that in addition to the authorities cited in the majority opinion, a sheriff's duty to provide bailiff services is established in *W.Va.Code, 50–1–14(a)* [1992] (magistrate courts); *W.Va.Code,* 48–4–10(d) [1993] (family law masters); *Adm. R. Mag. Ct.* 3(a) (magistrate courts); and *R. Pract. & Proc. Fam. L.* 17 (family law masters).

But I question whether the sheriff's power and duty to provide true "bailiff" services necessarily translates into a requirement that—if the sheriff in fact does not provide those services—they cannot be otherwise provided.

In the instant case, of course, the sheriff apparently asserts a willingness and ability to provide bailiff services. But that is probably not the case everywhere. If the sheriff does not provide such services, one alternative to legally compelling the sheriff to do so is to employ others to provide the services. I do not see this route as being foreclosed by the majority opinion. (Another alternative, of course, is to do nothing. But the majority opinion, Justice Workman's concurrence, and the dissent all ably point out why "doing nothing," in the court security area, is something that this Court will not tolerate.)

Finally, I note that the dissent raises several points that I understand to be legitimate concerns—but I ultimately think that these concerns are not legally persuasive. For example, I do not think that the giving of arrest, firearms, and use of force powers to non-deputy county employees working as security personnel would be seen by the dissenters as a violation of the separation of powers or as an unconstitutional private "police force," if the security personnel were guarding a county garage or office building.

As Justice Workman's concurrence notes, ultimately this case turns on its facts. An excellent system of court marshals in Putnam County has been put into place, filling a vacuum created by a longstanding failure to meet court security needs by the sheriff's office. This is a statewide problem. Despite the dissent's arguments, the existing law is certainly not *clear* that this new system is, in its entirety, impermissible. Therefore, this Court has taken the least intrusive approach and permitted the new system to operate within what the majority sees to be as the clear constraints of the law. I join in this approach.